RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0120p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOSEPH J. PLATT; PLATT FOR JUDGE CAMPAIGN COMMITTEE; MARK W. MILLER,

*Plaintiffs-Appellants*,

*v.*

No. 17-3461

BOARD OF COMMISSIONERS ON GRIEVANCES AND DISCIPLINE OF THE OHIO SUPREME COURT, et al.,

*Defendants*,

MAUREEN O'CONNOR; RICHARD A. DOVE; SCOTT J. DREXEL,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:13-cv-00435—Michael R. Barrett, District Judge.

Argued: January 25, 2018

Decided and Filed: June 25, 2018

Before: ROGERS, McKEAGUE, and WHITE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Christopher P. Finney, FINNEY LAW FIRM LLC, Cincinnati, Ohio, for Appellants. Drew H. Campbell, BRICKER & ECKLER LLP, Columbus, Ohio, for Appellees. **ON BRIEF:** Christopher P. Finney, FINNEY LAW FIRM LLC, Cincinnati, Ohio, for Appellants. Drew H. Campbell, Maria J. Armstrong, Gregory J. Krabacher, BRICKER & ECKLER LLP, Columbus, Ohio, for Appellees.

---

**OPINION**

---

McKEAGUE, Circuit Judge.   Like many states, Ohio wants the voting public to determine who will serve as its judges.  Yet Ohio, mindful of the potentially corrosive effects of uninhibited fundraising and partisanship, also wants to protect public trust in the judiciary's independence.  To serve these twin goals, the state fills judicial offices through elections, but imposes fundraising and advocacy limitations on anyone who seeks them.  This case requires us to decide whether those limitations accommodate both priorities in a manner consistent with the Constitution.

The plaintiffs in this case say they do not.  They object to six limitations, arguing that each variously violates the Constitution's free speech, due process, and equal protection guarantees.  In two separate summary judgment orders, the district court rejected the plaintiffs' claims.  Because Ohio's rules strike the delicate balance between the Constitution's commands and the state's desire to protect judicial integrity, we **AFFIRM**.

**I**

In Ohio, judges of the supreme court, courts of appeals, courts of common pleas, and all courts of record (including municipal courts) are selected through judicial elections.  The fundraising and political conduct of candidates for judicial office is governed by Canon 4 of the Ohio Code of Judicial Conduct.

Plaintiff Joseph Platt, an Ohio attorney, is such a candidate.  Platt formed the Platt for Judge Campaign Committee in June of 2013, naming Mark Miller as its treasurer.  The Committee and Miller join Platt as co-plaintiffs in this case (collectively, "Platt").[1]  With the Committee formed, Platt became a "judicial candidate" within the meaning of the Ohio Code of Judicial Conduct and thus subject to its commands.

---

[1]Notwithstanding the awkwardness of referring to multiple plaintiffs with the singular "Platt," we do so in lieu of the unhelpful and impersonal "Plaintiffs."

Platt believes that some of those commands violate his constitutional rights—to free speech, due process, and equal protection under the law.  Specifically, Platt objects to six provisions in Canon 4:

- Rule 4.1(A)(2), which prohibits a candidate from making speeches on behalf of a political party or another candidate for public office

- Rule 4.1(A)(3), which prohibits a candidate from publicly endorsing or opposing a candidate for another public office

- Rule 4.4(A), which, save for three exceptions, prohibits a judicial candidate from personally soliciting campaign contributions

- Rule 4.4(E), which creates a permissible window for soliciting and receiving campaign contributions, starting 120 days before the primary and ending 120 days after the general election

- Rule 4.4(F), which limits the solicitation and receipt of contributions for candidates defeated before the general election, until the earlier of 120 days after the primary election or until the candidate pays off her campaign-related debts

- Rule 4.4(G), which regulates the solicitation and receipt of contributions for candidates who die or withdraw from the election, until the earlier of 120 days after death or withdrawal or until the candidate pays off her campaign-related debts.

Wanting to engage in the sort of political advocacy and fundraising prohibited by these rules, Platt filed suit in June of 2013 in the Southern District of Ohio.  Platt named as defendants the Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court,[2] which enforces the Code of Judicial Conduct, the Ohio Supreme Court, which promulgates the Code, and the individual members of both entities (collectively, the "Board").[3]

Platt's complaint included three counts.  Count I challenged Rules 4.4(E), (F), and (G) (the "Fundraising Rules").  The Committee claimed those rules violated its right to receive contributions and disseminate information on Platt's behalf.  Treasurer Miller claims they violate

---

[2]The Board is now known as the Board of Professional Conduct.  https://www.bpc.gov/.

[3]The parties later stipulated that the only defendants who needed to remain in the litigation to afford plaintiffs complete relief were Maureen O'Connor, the Chief Justice of the Supreme Court of Ohio; Richard Dove, the Secretary of the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio; and Scott Drexel, the Board's Disciplinary Counsel.

his right to "receive information and ideas from judicial candidates." And Platt personally alleges that the rules infringe on his rights to free speech, association, due process, and equal protection. Count II targeted Rule 4.4(A)'s personal-solicitation provision (the "Solicitation Rule"), under the same basic theories as Count I, but without Platt's personal equal protection challenge. Count III included only claims by Platt personally. He alleged that Rules 4.1(A)(2) and 4.1(A)(3) (the "Endorsement Rules") violate his rights to free speech, association, due process, and equal protection.

The district court rejected all of Platt's claims, and he now appeals. He challenges four decisions by the district court: a protective order denying discovery, a refusal to take judicial notice, and two summary judgment orders. First, in September 2015, the court granted the Board's motion for a protective order, concluding that fact discovery was not necessary to evaluate whether Ohio had a compelling interest in maintaining its judiciary's integrity. Then, roughly one year later, the court granted the Board's cross-motion for summary judgment, concluding that the Endorsement Rules and the Solicitation Rule are not unconstitutionally vague. In the same order, the court also declined to take judicial notice of three news reports that Platt maintains would have aided his vagueness claim. And finally, in March 2017, the court granted the Board's motion for partial summary judgment, concluding that the Endorsement, Solicitation, and Fundraising Rules do not violate the First or Fourteenth Amendments.

**II**

We note at the outset that mootness concerns occupied this court at the preliminary injunction stage, *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 451-53 (6th Cir. 2014), and the district court at summary judgment. While mootness remains a thorny question—Platt did not run in either the 2014 or 2016 elections, and shows no intent to run in 2018—Platt's claims are saved from mootness under the "capable of repetition, yet evading review" exception. *Sosna v. Iowa*, 419 U.S. 393, 399-400 (1975). This circuit, and others, have been especially hesitant to find pre-enforcement election law challenges mooted by the passage of an election. So long as a candidate "retains the right to run for judicial office again," as Platt does here, they are ordinarily "sav[ed] . . . from mootness." *Carey v. Wolnitzek*, 614 F.3d 189, 197 (6th Cir. 2010); *accord Wolfson v. Brammer*, 616 F.3d 1045, 1055

(9th Cir. 2010) (holding claims not moot when candidate says he intends to run in some "future" election). The Board, for its part, does not even bother to argue that Platt's claims have been mooted. It seems instead that more than four years of litigation have left both sides eager to resolve this case. Confident that it still presents a live controversy, so are we.

### A.     Protective Order

The district court granted the Board's motion for a protective order denying Platt's discovery requests. Platt sought to compel fact discovery probing, among other things, the state's claim that it has a compelling interest in regulating judicial integrity through the challenged Code provisions and whether the provisions are under-inclusive or over-inclusive. The Board moved for a protective order against Platt's discovery request, based on the Supreme Court's decision in *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015), which held in part that fact discovery was not necessary to substantiate a state's interest in regulating judicial integrity.

A district court may grant a protective order under Fed. R. Civ. P. 26(c) to prevent "annoyance, embarrassment, oppression, or undue burden or expense." While the district court did not specifically refer to any of those reasons here, it ultimately concluded that Platt's discovery was simply "unnecessary" since the court could evaluate the merits of Platt's claims "without regard for evidentiary support." We review the district court's decision for abuse of discretion. *Samad v. Jenkins*, 845 F.2d 660, 663 (6th Cir. 1988) (citing *Davis v. Marathon Oil Co.*, 528 F.2d 395 (6th Cir. 1975)). An abuse of discretion occurred only if we are "left with a definite and firm conviction that [the district court] committed a clear error of judgment." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (alteration in original) (quoting *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002)).

The district court committed no clear error of judgment in granting the Board's protective order. It determined that fact discovery was unnecessary because such discovery would not aid the court in determining whether Ohio had a compelling interest in maintaining judicial integrity. That reasoning came straight from the Supreme Court's decision in *Williams-Yulee*: "The concept of public confidence in judicial integrity does not easily reduce to precise

definition, *nor does it lend itself to proof by documentary record*. But no one denies that it is genuine and compelling." 135 S. Ct. at 1667 (emphasis added). If *Williams-Yulee* concluded that a documentary record is unnecessary to *substantiate* a state's interest in maintaining judicial integrity, the district court correctly concluded that a record need not be created to *undermine* that interest.

The district court also relied on *Williams-Yulee* to conclude that discovery would not help Platt show that the Code was under-inclusive and thus did not advance the state's compelling interest. Because the Supreme Court assessed Williams-Yulee's tailoring arguments "without regard for evidentiary support," the district court felt it could do the same with Platt's. That conclusion shows no clear error of judgment. To the contrary, the district court fairly read and applied *Williams-Yulee*. The challenged provision in *Williams-Yulee* serves the same general purpose of the Code provisions that Platt challenges here, and yet the Court rejected Yulee's under-inclusivity arguments without considering documentary evidence. 135 S. Ct. at 1668-69. Any doubt that the Court did so is relieved by Justice Scalia's dissent, in which he criticized the majority for relying on its intuition rather than evidence that Florida's judicial regulations served their claimed purpose. *Id.* at 1678 (Scalia, J., dissenting) ("Neither the Court nor the State identifies the slightest evidence that banning requests for contributions will substantially improve public trust in judges."). Whatever fair criticism exists of the majority's approach in *Williams-Yulee*, the district court committed no clear error of judgment by duplicating that approach in this case.

Platt's best argument is one he doesn't thoroughly develop: Despite what *Williams-Yulee* says about fact discovery in the context of a First Amendment challenge to judicial campaign regulations, that case did not involve the vagueness and equal protection challenges that Platt's does. Therefore, Platt contends, even if discovery is unnecessary to evaluate the state's compelling interest in maintaining judicial integrity, it is necessary to evaluate whether the Code violates these other constitutional prohibitions. The district court addressed Platt's equal protection argument, and rightly dismissed it, noting that Platt's equal protection challenge implicates the same sort of theory he must develop under the First Amendment—namely, that

the state's regulations do not satisfy strict scrutiny. But the district court said nothing about whether the existence of Platt's vagueness challenge altered the discovery analysis.

Nevertheless, especially in light of the deferential abuse-of-discretion standard, we must affirm the district court's decision. The district court likely concluded that discovery targeted to develop Platt's vagueness claims was just as unnecessary as it was to develop his other claims. Why? Platt's vagueness claim required the district court to analyze whether the Code's language gave due notice of what behavior is prohibited and whether procedures exist to protect against arbitrary enforcement. But answering the first question—whether the Code "provide[s] a person of ordinary intelligence fair notice of what is prohibited," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (alteration in original) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008))—is a matter of reading the Code's language for its plain meaning. And the second question could readily be answered by reference to Ohio's publicly available enforcement procedures, including its practice of issuing advisory opinions to clarify the Code's enforcement. The district court did not commit a clear error of judgment by denying Platt further discovery related to these questions. We therefore affirm its grant of the Board's protective order.

### B.     Judicial Notice

Platt next argues that the district court erred in refusing to take judicial notice of three news reports. These reports concerned alleged political endorsements made by sitting members of the Ohio Supreme Court that were found not to violate the Code. Platt sought judicial notice for these reports in response to the district court's grant of the protective order.

Under Federal Rule of Evidence 201(b), a "court may take judicial notice of at least some documents of public record." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005). Such notice, however, is limited: a court may take notice of the documents and what they say, but it "[cannot] consider the statements contained in the document for the truth of the matter asserted." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014). This court reviews the district court's refusal to take judicial notice only for an abuse of discretion. *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002).

The district court did not abuse its discretion.  For while Platt averred in his motion that he sought notice only of "the existence of these news reports themselves as being in the public domain," he in reality asked for much more.  Platt in fact asked the court to consider statements in the articles concerning the disposition of the complaint against an Ohio Supreme Court Justice as evidence that "one must guess at the scope of what is permitted and prohibited under [the Code]."  That request runs afoul of the rule that notice of public documents is "proper only for the fact of the documents' existence, and not for the truth of the matters asserted therein." *Passa*, 123 F. App'x at 697.  As a result, the district court was well within its discretion to deny Platt's request.

Besides, even if Platt wanted judicial notice only of the *existence* of the news reports, that would not aid his vagueness claim.  The mere existence of news reports involving the Code does not somehow substantiate his claim that the Code is unconstitutionally vague.  *Cf. In re Omnicare*, 769 F.3d at 468 ("Moreover, this document helps KBC only if we can consider the contents of the agreement for the truth of the matter.").  Platt instead needs the court to accept that the articles contain true information—that the Ohio Supreme Court Justice said what the articles say she did, that the statements were made publicly, and that a review of those statements found no wrongdoing.  Only then might the statements, as Platt promises of them, "further reinforce and demonstrate the lack of the requisite precision and clarity necessary" to avoid vagueness problems with Rule 4.1(A)(3).[4]

We affirm the district court's denial of Platt's motion to take judicial notice.

**C.          Vagueness**

Platt alleges that three provisions of the code are unconstitutionally vague.  He first targets the Endorsement Rules: 4.1(A)(2), which prohibits judicial candidates from making speeches on behalf of a political party or another candidate for public office; and 4.1(A)(3),

---

[4]Even then, we remain uncertain whether the news reports would help Platt's cause.  The statements were made by a Supreme Court Justice about another candidate for the Supreme Court.  We know that the endorsement rules do not prohibit a candidate from making any statement regarding his own candidacy or his opponent(s). *See* R. 1-1, PID 35 ("These rules do not prohibit candidates from campaigning on their own behalf or from other permitted conduct.").  But it is unclear whether the rule applies to any statement made about any candidate for the same office, even if the candidate is not running for the same specific seat on the Supreme Court.

which prohibits judicial candidates from publicly endorsing or opposing another candidate for public office. He then takes aim at the Solicitation Rule, 4.4(A), which prohibits judicial candidates from personally soliciting financial contributions. The district court granted summary judgment in favor of the Board, finding that each of the challenged provisions provided candidates with fair notice of what conduct is prohibited.

Before reaching the merits of this claim, the Board argues that Platt did not preserve his vagueness challenge by failing to explicitly characterize his challenge as such in his complaint. We disagree. While it is true that Platt's complaint did not mention the words vague or vagueness, plaintiffs are not required to identify specific *theories of relief*; they need only specify a *claim*. *See Skinner v. Switzer*, 562 U.S. 521, 530 (2011); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995). Platt alleged the necessary claim: an unconstitutional deprivation of due process. *See* R. 1, Compl., ¶¶ 31, 35, 42, 48. He did not stipulate the legal theory underpinning that claim—that the regulations are void for vagueness, failing to provide fair notice and inviting arbitrary enforcement—but he is not required to do so. Platt's pleading was inexact, perhaps even sloppy, but it was not so inscrutable that it warrants a finding that he forfeited any vagueness claim. *Skinner*, 562 U.S. at 530 (emphasizing that a complaint need not be "a model of the careful drafter's art" nor provide "an exposition of his legal argument").

Platt's vagueness challenge nevertheless fails on the merits. A district court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court held that the Board was so entitled and granted summary judgment against Platt's vagueness claims. We review de novo, drawing all permissible inferences in favor of Platt. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).

To succeed on his vagueness claims, Platt must show either that the Code provisions (1) "fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorize[] or even encourage[] arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). While "a more stringent vagueness test should apply" to laws abridging the freedom of speech, that standard is relaxed somewhat by the fact that the Code imposes civil rather than criminal penalties and includes an implicit

scienter requirement.  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).  Platt does not show that the Code provisions fail in either *Hill* respect.

## 1.    Fair Notice

When determining whether a law provides sufficient notice to a person of ordinary intelligence, in the absence of state court guidance, we examine "the words of the ordinance itself."  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).  We are mindful that, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language."  *Id.*  The fact that a law is "marked by 'flexibility and reasonable breadth, rather than meticulous specificity'" does not render it unduly vague.  *Id.* (quoting *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1088 (8th Cir. 1969)).  Moreover, "[w]hen the common meaning of a word provides adequate notice of the prohibited conduct, the statute's failure to define the term will not render the statute void for vagueness."  *United States v. Hollern*, 366 F. App'x 609, 612 (6th Cir. 2010) (alteration in original) (quoting *United States v. Namey*, 364 F.3d 843, 844-45 (6th Cir. 2004)).  Said another way, where the challenged language "is commonly used in both legal and common parlance," it often will be "sufficiently clear so that a reasonable person can understand its meaning."  *Déjà vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trustees*, 411 F.3d 777, 798 (6th Cir. 2005) (en banc).

### a.    Rule 4.1(A)(2)

This provision provides that a judge or judicial candidate shall not "[m]ake speeches on behalf of a political party or another candidate for public office."**[5]**  Platt says the words "on behalf of" render the rule unconstitutionally vague.  The district court saw it differently, and held that "the language in Rule[] 4.1(A)(2) . . . is not difficult to understand" and would provide an ordinary person fair notice of what conduct is prohibited.  We agree.

There is no impermissible vagueness lurking in the words "on behalf of."  A common dictionary defines the phrase as: "in the interest of; as the representative of; for the benefit of."

---

**[5]**For reference, two other states in the Sixth Circuit have similar "on behalf of" prohibitions.  Michigan prohibits any speech "on behalf of a political party or nonjudicial candidate."  Michigan Code of Judicial Conduct, Canon 7(A)(1)(b).  And Tennessee prohibits any speech "on behalf of a political organization."  Tennessee Code of Judicial Conduct, Canon 4, Rule 4.1(A)(2).

*Webster's Third New International Dictionary Unabridged* 198 (2002). *Garner's Dictionary of Legal Usage* 106 (2011) says the phrase means "as the agent of, as representative of." A person of ordinary intelligence would know that this language—"commonly used in both legal and common parlance"—bars them from speaking as a party or candidate's representative. *Déjà vu*, 411 F.3d at 798.

And even if the words leave some wiggle room, the Code's comments, advisory opinions, and staff letters help clarify ambiguities and mitigate vagueness concerns. For example, the comments to Rule 4.1(A)(2) incorporate Rule 4.2(C), which lists various activities—among them, conducting joint fundraisers and stating an affiliation with a political party—that a judicial candidate may undertake. By clarifying what a judicial candidate may do, the reach of Rule 4.1(A)(2)'s prohibitions is clarified.

Platt does not quibble with the Board's textual arguments, instead focusing his attack on the Board's response to two hypotheticals Platt posed in interrogatories. The interrogatories and relevant portions of the accompanying responses are:

> **4.** May a judicial candidate, without violating Rule 4.1(A)(2) of the Ohio Code of Judicial Conduct, make a speech opposing another candidate for public office.
>
> **Response:** [A] violation of the Ohio Code of Judicial Conduct would be evaluated on a case-by-case basis, including whether the judicial candidate engages in conduct that constitutes 'oppos[ing] a candidate for another public office' in violation of 4.1(A)(3) or engages in other conduct in violation of Canon 4 that is 'inconsistent with the *independence*, *integrity*, or *impartiality* of the judiciary.'[6]
>
> **5.** May a judicial candidate, without violating Rule 4.1(A)(2) of the Ohio Code of Judicial Conduct, make a speech in support of another candidate for public office so long as the judicial candidate does not make such a speech 'on behalf of' the other candidate for public office. If a judicial candidate may do so without violating Rule 4.1(A)(2) of the Ohio Code of Judicial Conduct, explain how a judicial candidate ascertains or ensures that he or she is not making a speech 'on behalf of' another candidate for public office.
>
> **Response:** [Same as response to Interrogatory 4.]

---

[6]The response then directed plaintiffs-appellants to the advisory opinions, including particular ones potentially responsive to their question.

Platt claims those responses show Rule 4.1(A)(2) is unacceptably vague, because the "individuals specifically responsible for the adoption, enforcement and/or interpretation of such rules could not declare whether certain conduct is prohibited *vel non* under the pertinent rule." Not so.

First of all, the Board's responses to Platt's hypotheticals do not *admit* the provisions are vague by responding that "a violation of the Ohio Code of Judicial Conduct would be evaluated on a case-by-case basis." Specific facts matter, and it would be irresponsible of the Board to respond definitively to such blanket questions. And second, interrogatories four and five ask whether Rule 4.1(A)(2) would prohibit conduct that is more readily addressed by Rule 4.1(A)(3), which bars candidates from publicly endorsing or opposing candidates in races for other public offices. As the Board notes, the clarity of Rules 4.1(A)(2) and (A)(3) "is not undermined by interrogatories that ask whether the violation of one Rule is excused by compliance with another. Most important, neither interrogatory has anything to do with whether one can reasonably understand what the Rules prohibit." Platt's attempt to create confusion by asking the Board to apply a rule to a factual scenario clearly covered by another rule does not render the Code unconstitutionally vague.

In light of the plain language, clarifying comments, and advisory opinions, we hold that Rule 4.1(A)(2) is not unconstitutionally vague.

### b.          Rule 4.1(A)(3)

Rule 4.1(A)(3) provides that a judge or judicial candidate shall not "[p]ublicly endorse or oppose a candidate for another public office."[7] Platt's vagueness claim zeroes in on the words "publicly endorse." The district court found these words "not difficult to understand" and thus sufficient to put an ordinary person on notice of what conduct is prohibited. We agree.

---

[7]For reference, every other state in the Sixth Circuit has a similar non-endorsement rule. Kentucky's is identical. Kentucky Code of Judicial Conduct, Canon 5(A)(1)(c). Michigan prohibits endorsements of any "candidate for nonjudicial office." Michigan Code of Judicial Conduct, Canon 7(A)(1)(b). Tennessee prohibits judges and judicial candidates from "publicly endors[ing] or oppos[ing] a candidate for any public office." Tennessee Code of Judicial Conduct, Canon 4, Rule 4.1(A)(3).

Start with the language itself. The phrase "publicly endorse" is not vague. The words "publicly" and "endorse" are "commonly used in both legal and common parlance," such that a "reasonable person can understand [their] meaning." *Déjà vu*, 411 F.3d at 798. What it means to speak "publicly" is obvious enough: it covers communications through speeches, public advertisements, and the like. To "endorse" someone, meanwhile, is to "'support[] or aid[]' the other candidate, rather than supporting himself, 'by or as if by signed statement.'" *Winter v. Wolnitzek*, 834 F.3d 681, 691 (6th Cir. 2016) (quoting *Webster's Third New International Dictionary* 749 (3d ed. 2002)).

Those are straightforward terms, and combining them doesn't make them any more confounding. As the Board argues, "[a] common-sense reading of the Rule simply prohibits a candidate from expressing approval of another candidate for public office where the expression is visible or accessible to the community." Though not expressly addressing itself to a vagueness challenge, this court's analysis in *Winter* is instructive: "Voters understand the difference between a speech expressing, say, the judicial candidate's progressive vision for the Commonwealth and one, say, formally endorsing the Democratic nominee for Attorney General of Kentucky or President of the United States. The former helps the candidate; the latter helps the candidates for Attorney General and President." 834 F.3d at 691. If voters can understand that difference, judicial candidates can too.

And as with every provision of the Code, Rule 4.1(A)(3)'s intended reach is clarified by comments, advisory opinions, and staff letters. Of particular importance here are four advisory opinions cited by the Board that provide extensive clarification on the meaning of "publicly endorse." *See, e.g.*, R. 55, Ex. 2, Adv. Op. 2002-013 (defining "publicly endorse" as "to give approval or support to" and providing a non-exhaustive list of public-endorsement examples, including going door-to-door for another candidate and placing yard signs that support another candidate); R. 55, Ex. 3, Adv. Op. 2001-01 (concluding that wearing a campaign button supporting another candidate would violate the rule); R. 55, Ex. 4, Adv. Op. 92-11 (concluding that formal introductions of other candidates at political gatherings would violate the rule). Though a person of ordinary intelligence, without the aid of these advisory opinions, should

understand what it means to publicly endorse another politician, interpretive guides like these further undermine Platt's vagueness claim.

But Platt again protests with hypotheticals. The relevant interrogatories are:

**6.** May a judicial candidate, without violating Rule 4.1(A)(3) of the Ohio Code of Judicial Conduct, 'privately' endorse or oppose a candidate for another public office. If a judicial candidate may do so without violating Rule 4.1(A)(3) of the Ohio Code of Judicial Conduct, explain how a judicial candidate ascertains or ensures that he or she is 'privately' (as opposed to 'publicly') endorsing or opposing a candidate for another public office.

**7.** May a judicial candidate, without violating Rule 4.1(A)(3) of the Ohio Code of Judicial Conduct, publicly speak in support of or favorably towards another candidate for public office so long as the judicial candidate does not expressly utilize the word 'endorse' or a variation thereon, *e.g.*, 'endorsement,' 'endorsing,' etc.

The Board's responses included the same "case-by-case basis" refrain as its responses to interrogatories four and five.

These exchanges do not, as Platt wishes, establish the rules as unduly vague. They instead only illustrate the inadvisability of trying to provide definitive answers to incomplete and ill-defined factual scenarios. Take Platt's sixth interrogatory. The knee-jerk answer appears to be "yes." Rule 4.1(A)(3) by its terms prohibits public endorsements, not private ones, and so a judicial candidate would likely *not* run afoul of the Rule by, for example, pledging fealty to another candidate around the family dinner table. But if a media member is the candidate's dinner guest in that instance, the Board's analysis may well differ. The answer to Platt's seventh interrogatory, meanwhile, would seemingly almost always be "no." To speak in support of a candidate, even without using the specific word "endorse," is nevertheless to endorse that candidate—and so a judicial candidate likely *would* violate the Rule by publicly doing so. R. 55, Ex. 2, Adv. Op. 2002-013 (describing illustrative endorsement activities as those that "show public approval and support" for other candidates). But specific facts, including the precise words the candidate uses and the audience to whom he or she is speaking, would determine whether the candidate has moved from permissible discussion on contentious legal or political subjects to prohibited advocacy for a specific candidate. *See Winter*, 834 F.3d at 690.

The Board's refusal to answer Platt's hypotheticals does not constitute an admission that Rule 4.1(A)(3) is vague. On the contrary, we hold that the rule's plain language and the Board's clarifying comments and advisory opinions provide candidates fair notice of what conduct the rule prohibits.

### c.          Rule 4.4(A)

This provision provides that a judicial candidate, with certain limited exceptions, shall not "personally solicit campaign contributions."[8] There is no real dispute about what constitutes a campaign contribution, but Platt claims the meaning of "personally solicit" is unconstitutionally elusive. The district court didn't think so, and we once again agree.

There is little for us to add to the district court's analysis explaining why Rule 4.4(A) is not unduly vague. The court essentially reproduced its Rule 4.4(A)-vagueness analysis from the companion case to this one. R. 86, PID 2186-88 (discussing *O'Toole v. O'Connor*, No. 2:15-CV-1446, 2016 WL 4394135, at \*16–17 (S.D. Ohio Aug. 18, 2016), *reconsideration denied*, 260 F. Supp. 3d 901 (S.D. Ohio 2017)). *O'Toole* said the Rule's language was plenty clear:

> The two words at issue are 'personally' and 'solicit.' 'Personally' means, 'so as to be personal: in a personal manner; *often*: as oneself: on or for one's own part.' *Webster's Third New International Dictionary, Unabridged* (2016). 'Solicit' means, 'to make petition to . . . especially: to approach with a request or plea (as in selling or begging).' *Id.* Especially in combination with the provision of a campaign committee that may directly solicit contributions, this prohibition is not difficult to understand: the judicial candidate cannot hold out her hand and ask people for money—her committee can.

2016 WL 4394135 at \*16. So far, so good.

But for a third time, Platt parries with his hypotheticals and the Board's responses. Platt points to five interrogatories; two of them, eight and eleven, are representative:

> **8.** For purposes of this interrogatory, a 'bundler' is a person who solicits and/or gathers contributions from many different individuals or entities with the goal or purpose of raising or gathering at least a certain targeted level of accumulated

---

[8]Every other state in the Sixth Circuit has an essentially identically worded rule. Kentucky Code of Judicial Conduct, Canon 5(B)(2); Michigan Code of Judicial Conduct, Canon 7(B)(2)(a); Tennessee Code of Judicial Conduct, Canon 4, Rule 4.1(A)8).

contributions, and then presents the accumulated contributions (or 'bundle') to a campaign committee in one lump sum. May a judicial candidate, without violating Rule 4.4(A) of the Ohio Code of Judicial Conduct, personally solicit or request a person to serve as a 'bundler' of campaign contributions in support of such candidate's judicial campaign.

…

**11.** May a judge or a judicial candidate, without violating the Ohio Code of Judicial Conduct, personally encourage or lobby individuals or organizations not to make a financial contribution to the campaign committee of a judicial candidate. If such action constitutes or may constitute a violation of the Ohio Code of Judicial Conduct, identify the specific rule which is or may be violated by such conduct.

The Board gave its same "case-by-case basis" response, and Platt again contends that is tantamount to conceding that Rule 4.4(A) is unconstitutionally vague. We—again—disagree.

The "bundler" question posed in the eighth interrogatory presents the toughest puzzle yet. But we stress, like the district court in *O'Toole*, that we need not come up with confident answers to Platt's hypotheticals to uphold the Code as constitutional:

To start, a rule is not unconstitutionally vague because a plaintiff presents a tough hypothetical. *See Grayned*, 408 U.S. at 112 n.15 ("It will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" (quoting *Am. Commc'ns Assn. v. Douds*, 339 U.S. 382, 412 (1950))). "Close cases can be imagined under virtually any statute." *United States v. Williams*, 553 U.S. 285, 306 (2008). The Court could uphold the rule even under pressure from Plaintiffs' hypotheticals . . . .

2016 WL 4394135 at *17. Hypotheticals are a favorite tool of those bringing vagueness challenges, but we must, like *O'Toole*, point out the obvious: almost any criminal or civil prohibition is susceptible to clever hypotheticals testing its reach. Any law student, intimately familiar with the classic "issue-spotter" exam, knows this well. The very point of a well-crafted exam is to test the student's ability to apply a given law or set of laws to novel facts, and the very sharpest students will often come to different bottom-line conclusions: Did Terry TaxEvader violate the Internal Revenue Code? Maybe so. But then again—maybe not.

The *O'Toole* court nevertheless charged forward and concluded that soliciting a bundler's help in gathering contributions would be prohibited by Rule 4.4(A). 2016 WL 4394135 at *17. Because in Platt's hypothetical "the bundler acts at the personal request of the judicial

candidate," *O'Toole* reasoned that the candidate would be "personally soliciting a larger contribution from the bundler" and thus violating Rule 4.4(A). *Id.* That may well be correct. Then again, the rationale that motivates Rule 4.4(A) is not as clearly implicated in the bundler situation as it would be, say, where a judicial candidate personally solicited a large contribution from a local lawyer. That much is clear from the first comment to Rule 4, which defends the personal solicitation ban as necessary to "avoid[] the appearance of coercion or *quid pro quo*, especially when a judicial candidate engages in a one-on-one solicitation of a lawyer or party who appears before the court." Though the candidate in Platt's hypothetical personally solicits the bundler's *assistance* in collecting contributions, the candidate is not asking for the bundler's *money*; indeed, the bundler has the happy effect of screening the candidate from his benefactors. Because this is a close question, we leave it to the Board to decide—if it is ever confronted with it—on a complete factual picture. But we will not say that the difficulty of answering it in the abstract renders the rule vague. One difficult scenario does not make the words "personally solicit" constitutionally infirm.

As for Interrogatory 11—the counter-solicitation question—the *O'Toole* court said Rule 4.4(A) would not prohibit this conduct. *O'Toole* reasoned that a candidate saying "'Please don't give any money to my opponent'" is not soliciting a contribution; he is, rather, soliciting a "promise not to give money to the other side." *Id.* And a promise not to contribute to one's opponent does not qualify as a "contribution" within the meaning of the Code, which defines "contribution" in the same way Ohio's Revised Code, 3517.01 does: a "loan, gift, deposit, forgiveness of indebtedness, donation, advance, payment, or transfer of funds or anything of value." But we again decline to answer Platt's hypothetical ourselves. Though it seems unlikely that a judicial candidate would violate Rule 4.4(A) through counter-solicitation, that is a question for the Board to decide with a complete set of facts before it. That the answer the Board reaches might depend on certain factual nuances does not compel the conclusion that the rule is unconstitutionally vague.

In sum, we conclude that the Code's plain language and clarifying comments, and the Board's elaboration through staff letters and advisory opinions, provide fair notice to judicial candidates of what conduct is prohibited.

### 2.     Arbitrary Enforcement

To the extent Platt argues the challenged Code provisions are unconstitutionally vague because they invite arbitrary and inconsistent enforcement, *Hill*, 530 U.S. at 732, we can analyze the provisions collectively.  The key question here is whether the Code "provide[s] explicit standards guiding [its] enforcement." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998).  The district court held that the Code did so, referring to the Board's use of advisory opinions to add further detail to the Code's prohibitions and prevent abuse.  We agree.

The analysis under the second vagueness prong is necessarily duplicative of the first.  For example, Platt complains that the Code "allows for *ad hoc* standards for enforcement," but that argument flows from his hypothetical-based argument that the Code's prohibitions are too vaguely framed.  Appellants' Br. at 19.  The Board's first response to the charge that the Code invites arbitrary enforcement, meanwhile, is a reference to "the standards embedded in the Rules themselves."  Appellees' Br. at 50.  But beyond these two points—which are fully explored above—the Board offers additional evidence that the Code's enforcement procedures contain "clear standards to guide the discretion" of the Board.  *Leonardson v. City of E. Lansing*, 896 F.2d 190, 198 (6th Cir. 1990).

Specifically, the Board directs us to "the multi-step process mandated before a candidate can[] be deemed to have violated any Rule; the requirement of proof by clear and convincing evidence before a five-member panel may address sanctions; and appeal to the Ohio Supreme Court."  These safeguards are extensive.  Once the Board receives a grievance alleging a violation of the Code, the Board's Director conducts an initial screening.  If it passes this initial screen, a three-member panel of the Board then determines whether there is probable cause to believe that a violation occurred.  Probable cause exists only when there is "substantial, credible evidence that misconduct has been committed."  If that three-member panel finds probable cause, the case proceeds to a hearing before a three-member panel of the Board.  And critically, the panel must find a violation by clear and convincing evidence.  That requirement alone undermines any argument that the Code can be arbitrarily and abusively enforced.  *Cf. Williams*,

553 U.S. at 306 (2008) (noting the "problem" of close cases "is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt.")

And that's not the end of it:  A clear-and-convincing finding leads only to yet another Board review, this time by a five-member panel of judges, to determine appropriate sanctions. Any sanctions imposed are appealable to the Ohio Supreme Court, whose decision is informed by "the duties violated, respondent's mental state, the injury caused, the existence of aggravating or mitigating circumstances, and applicable precedent."  *Disciplinary Counsel v. Kaup*, 806 N.E.2d 513, 516 (Ohio 2004).  This enforcement process does not afford unrestrained discretion that can be put to pernicious purposes.

Unable to show that the Code fails to provide fair notice of what conduct is prohibited or that the Code is arbitrarily enforced, Platt's vagueness challenge fails.

### D.     First Amendment

Platt alleges that Rules 4.1(A)(2), 4.1(A)(3), 4.4(A), 4.4(E), 4.4(F), and 4.4(G) all impose impermissible content-based restrictions on core political speech in violation of the First Amendment.  The regulations limit the fundraising and political activity of judges and judicial candidates; both parties agree that such limitations must survive strict scrutiny to pass constitutional muster.[9]  This means the Code's rules must be "narrowly tailored to serve a compelling interest." *Williams-Yulee*, 135 S. Ct. at 1664.

Before addressing whether that is true of the Rules at issue here, we first address an argument permeating Platt's entire First Amendment challenge: that he should win simply because the Board failed to present sufficient evidence to satisfy its summary judgment burden. For the reasons stated in our discussion of the protective order, this argument fails.  The Supreme

---

[9]Despite the parties' consensus, we note that there remains some question whether the Fundraising rules—which establish the timeframe in which campaign committees may receive contributions—should receive strict scrutiny or instead be reviewed under the more deferential "closely drawn" rubric applied to contribution limitations in *Buckley v. Valeo*, 424 U.S. 1, 25 (1976), and later in *Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (plurality opinion).  While those cases involved regulations on the *amount* of a given contribution, and this case deals with limitations on the *timing* of contributions, there is a good argument the same more-relaxed standard should apply to each.  At least one court of appeals has concluded as much. *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1117-18, 1122-23 (9th Cir. 2011).  Nevertheless, because the parties do not brief this question, and because the result we reach today would be the same under either standard, we do not express a view one way or another on the issue.

Court in *Williams-Yulee* already decided that states' interest in maintaining judicial integrity need not be substantiated by documentary evidence. 135 S. Ct. at 1667. That is why, as the district court here noted, the Court was able to apply strict scrutiny to Florida's judicial election rules "without regard for evidentiary support." R. 49, Op. and Order, PID 1237-38 (discussing *Williams-Yulee*). If the Supreme Court was satisfied it could conduct the constitutional analysis required in cases like these without a developed documentary record, it was proper for the district court to do the same.

Turning now to that analysis, we proceed as follows: first, we assess the state's claimed interest for the rules collectively, since the same interests—preserving judicial integrity and protecting public trust in the judiciary—are invoked for each Rule; second, we evaluate whether each Rule individually is narrowly tailored to serve that interest.

### 1.          Compelling Interest

The Board identifies two distinct compelling interests served by the Rules: maintaining judges' actual independence and impartiality, and maintaining the public's trust in the judiciary's independence and impartiality. These claimed interests are not litigation-driven concoctions; the preamble to the Code says as much in its first sentence. The preamble states that an "independent, fair and impartial judiciary is indispensable to our system of justice" and that the Code's rules are premised on the idea that judges must "strive to maintain and enhance confidence in the legal system." Code of Judicial Conduct Preamble ¶ 1

These twin interests are compelling and thus clear the first strict scrutiny hurdle. The first, actual impartiality, is self-evidently crucial: "Litigants have a due process right to a trial before a judge with no 'direct, personal, substantial pecuniary interest' in the outcome." *Carey v. Wolnitzek*, 614 F.3d 189, 204 (6th Cir. 2010) (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). This goes hand-in-hand with the second interest, for "the legitimacy of the judiciary rests on delivering on that promise and in furthering the public's trust in the integrity of its judges." *Id.* A scrupulously independent judiciary means little, after all, if the public does not view it as such.

The Supreme Court has time and again affirmed states' powerful interest in ensuring impartiality in practice and in perception. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009) (stating that judicial conduct codes "serve to maintain the integrity of the judiciary and the rule of law," a "vital state interest"); *Republican Party of Minnesota v. White*, 536 U.S. 765, 793 (2002) (Kennedy, J., concurring) ("The citizen's respect for judgments depends in turn upon the issuing court's absolute probity.  Judicial integrity is, in consequence, a state interest of the highest order.").  And in *Williams-Yulee*, the Court, informed by these prior judgments, expressly held that Florida's interest in safeguarding the public's confidence in the judiciary was a compelling interest that justified limitations on judicial candidate speech.  135 S. Ct. 1666.

Platt, however, argues that while *Williams-Yulee* and other prior cases recognized the compelling interest states have in maintaining judicial integrity (and the appearance of it), no case has done so with respect to "each rule being challenged herein" and "in the particular context of such rules being applied against non-sitting judicial candidate[s] and/or their campaign committees."  Platt's arguments miss the mark.

Take first Platt's argument that *Williams-Yulee* cannot be applied to any rule in this case that differs from the solicitation rule at issue there.  Platt finds no support for such a cramped interpretation of *Williams-Yulee*.  Courts have instead read and applied its lessons broadly. For instance, the Ninth Circuit's decision in *Wolfson v. Concannon*, 811 F.3d 1176 (9th Cir. 2016) (en banc), reasoned from *Williams-Yulee* that Arizona had a compelling interest in limiting endorsements by judicial candidates.  *Id.* at 1183.  It made no difference to the Ninth Circuit that it was evaluating an endorsement (rather than solicitation) limitation, because *Williams-Yulee* "addressed not just a prohibition on personal requests for campaign contributions, but state restrictions on judicial candidate speech generally."  *Id.* at 1181.

This court, though less explicitly, embraced the same expansive reading of *Williams-Yulee* in *Winter v. Wolnitzek*, 834 F.3d 681 (6th Cir. 2016).  In analyzing several Kentucky judicial-election regulations, we said that the same compelling interests—maintaining judicial impartiality in practice and perception—justified various restrictions.  Assessing Kentucky's endorsement rule, we said the state had a "compelling interest in preventing judges from becoming (or being perceived as becoming) part of partisan political machines" and in "keeping

its judges above the partisan fray of trading political favors." *Id.* at 691. And addressing Kentucky's rule prohibiting judges from acting as a leader of a political organization, we said such a rule "targets an admirable goal (preserving public confidence in its judges)," and cited to *Williams-Yulee* in doing so. *Id.* at 692. *Winter* is thus good authority for the proposition that the broad interest in judicial impartiality recognized in *Williams-Yulee* is applicable to the solicitation, fundraising, and endorsement rules challenged by Platt. So, too, is our preliminary injunction decision in the companion case to this one. *O'Toole*, 802 F.3d at 789-90. When O'Toole argued that the *Williams-Yulee* interest "applies only to the direct solicitation of contributions by a judge," not to Rule 4.4(E)'s temporal limitations on receiving campaign contributions, we answered that the timing rule "implicates many of the same concerns regarding judicial integrity and propriety." *Id.*

*Winter* also dispenses with Platt's second charge—that however compelling the state's interest might be in regulating sitting judges' campaigning, that interest recedes as applied to non-sitting judicial candidates. *Winter* indicates otherwise. The challengers in that case comprised one sitting judge and two non-sitting judicial candidates, and there is nothing in the opinion that indicates the compelling interest analysis varied according to the challenger's status. *Winter*, 834 F.3d at 686. It would be odd if there were—the state's interest applies equally to each, since the state's objective is to ensure actual impartiality and the perception of it by keeping *any candidate* for judicial office insulated from "quid pro quo politics." *Id.* at 691. The candidate who may *become* a judge must be policed just as the *sitting* judge is; if not, the public's trust in the former would be diminished. Furthermore, as explained below in our discussion of Platt's equal protection claim, adopting two different sets of rules for sitting judges and non-sitting candidates would create more constitutional problems than it would solve. *See Wolfson*, 811 F.3d at 1190 (Berzon, J., concurring).

And finally, in *O'Toole*, we decisively rejected Platt's argument that *Williams-Yulee* does not bear on our analysis of the rules regulating campaign committees as opposed to individual candidates. While it is true that *Williams-Yulee* dealt only with a judicial candidate's *personal* solicitation, "the close connection between judicial candidates and their campaign committees under Ohio law implicates many of the same concerns regarding judicial integrity and propriety."

*O'Toole*, 802 F.3d at 789-90.  Indeed, judicial campaign committees are products of, and may include, the candidate herself.  *See* Ohio Rev. Code § 3517.01(C)(1) (defining "campaign committee" as "a candidate or a combination of two or more persons authorized by a candidate . . .to receive contributions and make expenditures"); Ohio Jud. Cond. R. 4.4(A) ("A judicial candidate may establish a campaign committee to manage and conduct a campaign for the candidate . . . .").  "Moreover, in addition to the actual or apparent authority judicial candidates wield over their campaign committees, Ohio law requires that '[t]he name of a campaign committee shall include at least the last name of the campaign committee's candidate,' further aligning the committee with the candidate in the eyes of the public."  *O'Toole*, 802 F.3d at 790 (alteration in original) (quoting Ohio Rev. Code § 3517.10(D)(1)).

We therefore have no trouble relying on *Williams-Yulee* for the proposition that a compelling interest justifies Ohio's restrictions on judicial candidates—whether sitting judges or not—and their campaign committees.

### 2.          Narrow Tailoring

For Ohio's rules to clear the second strict scrutiny hurdle, they must advance the state's interests, and they must do so without being either too over-inclusive or under-inclusive.  A rule guilty of the former infringes on protected speech beyond the degree necessary to achieve the state's compelling interest, *Republican Party of Minnesota v. White*, 536 U.S. 765, 775 (2002), while a rule guilty of the latter may "reveal that a law does not actually advance a compelling interest," *Williams-Yulee*, 135 S. Ct. at 1668.  This does not mean, however, that we must find the challenged Rules are "perfectly drawn."  *Winter*, 834 F.3d at 692 (holding that Kentucky judicial election law survived strict scrutiny despite a "modest under-inclusivity problem").  On the contrary, "[t]he impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary."  *Williams-Yulee*, 135 S. Ct. at 1671.  Thus, rather than second-guess every close constitutional shave in this context, the Court has insisted that states' "considered judgments deserve [a reviewing court's] respect, especially because they reflect sensitive choices by States in an area central to their own governance—how to select those who sit as their judges."  *Id.* (internal quotation marks omitted).

The district court, for its part, found it unnecessary to conduct tailoring analysis anew, relying instead on the Sixth Circuit's preliminary injunction ruling in this case, *Platt*, 769 F.3d at 451, and its preliminary injunction ruling in a companion case, *O'Toole*, 802 F.3d at 783. R. 87, Op. and Order, PID 2200-01 (noting it was "unnecessary to re-visit the decisions of law made by this Court and affirmed by the Sixth Circuit" in preliminary injunction cases). The problem with that approach is that a court's preliminary injunction decision is a limited one—a point the earlier panel in Platt's case made explicitly:

> Our opinion does not guarantee the State a win on the merits. Far from it: We, like the Supreme Court, do not intimate [a] view on the merits one way or the other. The ultimate issue—whether Ohio's narrower Code provisions satisfy the First Amendment principles discussed in *Carey*—remains an open question . . . . But now is not the time for us to answer that question. Here, we conclude only that, upon de novo review, Platt has not established a strong likelihood of success on the merits, and that the district court did not abuse its discretion in balancing the four preliminary-injunction factors.

*Platt*, 769 F.3d at 455 (internal quotation marks and citations omitted). At summary judgment, however, rather than reviewing a district court decision evaluating whether the movant had demonstrated a *likelihood* of success on the merits, we must decide whether the district court correctly concluded that the Board in fact *succeeds* on the merits. And our review is de novo, not the deferential abuse-of-discretion standard used at the preliminary injunction stage.

Nevertheless, as the tailoring analysis for each Rule below yields, the district court arrived at the correct ultimate conclusion for each Rule—they are all narrowly tailored to serve Ohio's compelling interest in maintaining the judiciary's integrity.

### a.    Rules 4.4(E), (F) and (G)

The Fundraising Rules together establish the permissible time-periods for contributions.[10] Rule 4.4(E) permits candidates to receive contributions beginning 120 days before the pertinent primary election, while Rule 4.4(F) permits that fundraising to continue through 120 days after

---

[10]Every state in the Sixth Circuit establishes fundraising windows, though Ohio's 120-day rule appears to allow the shortest amount of time before the primary. Kentucky allows the next shortest amount, allowing fundraising to begin 180 days before the primary. Kentucky Code of Judicial Conduct, Canon 5(B)(2). On the other hand, Michigan permits no fundraising after the date of the election. Michigan Code of Judicial Conduct, Canon 7(B)(2)(d).

the primary, or the general election if the candidate wins his or her primary. Rule 4.4(G), meanwhile, permits fundraising for 120 days after a candidate's death or withdrawal from a campaign.

The Board contends these Rules, by allowing fundraising only "within reasonable proximity to an election, . . . advance the State's interests in the perception and reality of judicial independence, integrity, and impartiality." The Board also maintains that the fundraising rules are neither over-inclusive—since they do not proscribe self-funding, campaign spending, and other campaign activities—nor under-inclusive—since they apply "evenhandedly to all judges and judicial candidates," *Williams-Yulee*, 135 S. Ct. at 1669. The district court agreed, though without much of its own analysis. For the reasons set forth below, we affirm.

It is easier to show why the Fundraising Rules pass constitutional muster by explaining why Platt's arguments to the contrary are unconvincing. Let's begin with Rule 4.4(E). Platt alleges it suffers from two fatal flaws: first, it creates disparities by allowing incumbents to hold onto previously raised funds for use in their reelection battles, giving them an edge over first-time candidates who must rely only on the funds raised in the permitted period; and second, the Board has produced no evidence showing a "nexus" between the "prohibition . . . and the interest supposedly being advanced." The first argument sounds in equal protection rather than the First Amendment, and we address it more completely in Section E. of this opinion.[11] The second can be readily dismissed here.

While Platt urges the court to not "cavalierly accept the *ipse dixit* of Defendants-Appellees *sans* actual proof," Appellants' Br. at 41, *Williams-Yulee* made clear that, for better or for worse, the Board need not produce documentary evidence to substantiate precisely how

---

[11]Moreover, to the extent Platt suggests the alleged inequalities caused by the rule constitute a First Amendment violation, his argument is in some tension with two principles announced by the Supreme Court. First, such an argument ignores the Supreme Court's admonition that legislative rules may not be crafted to "level the playing field, or to level electoral opportunities, or to equaliz[e] the financial resources of candidates." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1450 (2014) (alteration in original) (internal quotation and citation omitted). And second, he cannot show any intent by Ohio to harm first-time judicial candidates, as is usually required to strike down a law that is facially neutral. *See Buckley v. Valeo*, 424 U.S. 1, 31 (1976) ("Absent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions."); *see also Thalheimer v. City of San Diego*, 645 F.3d 1109, 1121-22 (9th Cir. 2011) (noting that this *Buckley* principle "undercut" challenger's argument that law treating judicial candidates and incumbents the same nevertheless favored incumbents.).

(or how well) these Rules serve its claimed interests, 135 S. Ct. at 1667 ("The concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record."). Rather, speech limitations may survive strict scrutiny when the manner in which they serve a state's interest are "intuitive." *Id.* at 1666. And because it makes intuitive sense that campaign contributions tightly cabined to the election date will minimize the "quid pro quo appearance problems" the state is worried about, *Winter*, 834 F.3d at 692, Platt's argument fails.

We explained the intuition underpinning Rule 4.4(E) in *O'Toole*. Because "contributions that are not proximate in time to an election can increase the appearance of impropriety and the risk of actual bias," the rule wisely "prohibits the solicitation and receipt of funds only during the period of time that most implicates the government's stated interests." *O'Toole*, 802 F.3d at 790. And we aren't the only court to make this point. *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1121 (9th Cir. 2011) (recognizing that a temporal contribution limit "reduces actual and perceived corruption because those contributions made near an election are clearer expressions of political speech, whereas off-year contributions are more likely linked to business the donor has before the city, thus creating the appearance of quid pro quo corruption by the sale of influence."); *Caperton*, 556 U.S. at 886 (emphasizing that the "temporal relationship between the campaign contributions, the justice's election, and the pendency of the case is . . . critical" in due-process bias analysis).

The Sixth Circuit has even approved of temporal limits on campaign fundraising beyond judicial elections. In *Gable v. Patton*, 142 F.3d 940 (6th Cir. 1998), we considered the constitutionality of a Kentucky law prohibiting any gubernatorial candidate from receiving contributions during the twenty-eight days preceding a primary or general election. We upheld the restriction, relying heavily on *Buckley v. Valeo*, 424 U.S. 1, 21-22 (1976), in which the Supreme Court sanctioned limitations on the size of individual contributions to candidates. *Gable*, 142 F.3d at 950-51. We reasoned: If *Buckley* said limitations on the *size* of contributions were permissible, then it followed that limitations on the *timing* of contributions were similarly above board. While both limitations may "force candidates to rearrange their fundraising"—the size cap means candidates must solicit a greater number of smaller donations, while the timing

rules compel candidates to concentrate fundraising efforts to the prescribed timeframe—they are justified by the state's "interest in combating corruption." *Id.* at 951.

As in *Gable*, so in this case. The fact that the rule in *Gable* regulated gubernatorial candidates in partisan elections and imposed somewhat different timing restrictions does not make it less persuasive here. Just the opposite is true. Corruption in the judiciary, or even the appearance of it, is an anathema: the state's interest in regulating elections to guard against those evils is at its peak. Common sense tells us this, and good authority does too. *Williams-Yulee*, 135 S. Ct. at 1667 ("[A] State's interest in preserving public confidence in the integrity of its judiciary extends beyond its interest in preventing the appearance of corruption in legislative and executive elections."); *Winter*, 834 F.3d at 695 ("[T]reating elections for the courts just like elections for the political branches does not make sense" because judges "are supposed to follow the rule of law—no matter current public opinion, no matter the views other political branches, no matter the views of the parties that support them."). What is good enough for the goose is still better for the gander: If temporal contribution limits are tolerable in partisan executive elections, it follows that they are also permissible in judicial races.

We recognized the basic legitimacy of temporal limitations in our decision denying a preliminary injunction in the companion to this case. *O'Toole*, 802 F.3d at 790. Mindful that the decision evaluated only the plaintiff's *likelihood* of success, its reasoning is still instructive. In a vein similar to *Gable*, the *O'Toole* court said that if the Supreme Court permitted Florida's absolute prohibition on candidate solicitation in *Williams-Yulee*, it made sense to think a rule constraining only the timing of campaign contributions was also constitutional. *Id.* ("The regulation at issue in this case restricts an even narrower slice of speech . . . ."). And again, that Rule 4.4(E) "prohibits the solicitation and receipt of funds only during the period of time that most implicates the government's stated interests, *recognizing that contributions that are not proximate in time to an election can increase the appearance of impropriety and the risk of actual bias*," further reinforced the Rule's constitutionality. *Id.* (emphasis added).

Even so, Platt argues that the rule bars too much speech because it effectively silences non-sitting judicial candidates. But the rule does not mean—as Platt says it does—that non-sitting candidates "cannot engage in any political speech" until 120 days before the primary.

Rather, Rule 4.4(E) means what it says: candidates may not engage in *fundraising* outside the prescribed period. Candidates are otherwise free to engage in a wide range of political activity, including contributing and spending their own money, attending political functions, public speaking, door-to-door campaigning, and marshalling volunteers who can do all those things on their behalf. *O'Toole*, 802 F.3d at 790. In other words, candidates can do everything they need to do—short of soliciting and receiving financial contributions—to cultivate a base of support that can propel them to victory at the polls.

And though fundraising is of course important to effective speech, the limits here are not nearly as onerous as Platt makes them out to be. A candidate who loses in the primary still enjoys eight months (four before, four after the election) for fundraising. A candidate who wins in the primary, meanwhile, can continue raising funds from the four months before his primary all the way through four months after the general election. As the Board demonstrates in its brief, Platt's campaign committee could have received contributions for as long as nineteen months during the 2016 election cycle. Viewing this fundraising window more comprehensively, and keeping in mind that other means of campaigning remain open to candidates, Rule 4.4(E) is not as suffocating as Platt suggests.

That leaves only an argument that Rule 4.4(E) is under-inclusive, an argument Platt does not appear to develop, if he makes it at all. But Platt's emphasis on the need for a no-carryover-funds rule in the context of his equal protection claim could be taken as an under-inclusivity argument under the First Amendment. The fact that Rule 4.4(E)'s contribution rule is not coupled with a rule requiring candidates to disgorge campaign finances after the election may "raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Williams-Yulee*, 135 S. Ct. at 1668 (citation and quotation marks omitted). The theory would be that, if the state is so concerned about minimizing the appearance of quid pro quo impropriety that it needs to cabin the solicitation and receipt of contributions close to the election, then it should also require candidates to surrender campaign funds that are not necessary to success in that election. To cure this First Amendment defect, the argument goes, the state would have to curb *more* speech. But we don't think the absence of a no-carryover-funds rule renders Rule 4.4(E) under-inclusive. First, Ohio already

places limits on how candidates can speak with the money they raise—only those limits focus on the *character* of the speech (e.g., bans on endorsements, speaking as a party spokesperson), not the *quantity* of speech (what a disgorgement rule would target). And second, Rule 4.4(E) limits the solicitation and receipt of contributions, actions that inevitably jeopardize the public trust in a judge's independence; a no-carryover-funds rules, by contrast, would prevent judicial candidates from engaging even in benign political speech and thus lacks a similarly powerful justification.

We grant, as we did in *O'Toole*, that the "specific time limit . . . may appear arbitrary." 802 F.3d at 791. But, so too, it seems, would any other line Ohio or this court could draw. Consider the timing rules used in other states within this Circuit. Kentucky, for instance, allows judicial candidates' committees to solicit funds starting 180 days before the primary. Kentucky Code of Judicial Conduct, Rule 5(B)(2). If we hold today that Ohio's rule is too restrictive, how would the next court decide whether Kentucky's 60 additional days make a constitutional difference? "[I]t is exactly this type of line drawing that the Supreme Court sought to avoid 'wading into' in explaining that narrow tailoring does not mean 'perfectly' tailoring." *O'Toole*, 802 F.3d at 791 (quoting *Williams-Yulee*, 135 S. Ct. at 1671) (brackets omitted). We will not make the very mistake the Supreme Court cautioned against by wading into that morass today. Instead, we reject Platt's challenge to Rule 4.4(E) and conclude that it is narrowly tailored to advance Ohio's compelling interest in maintaining judicial integrity.

As for Rules 4.4(F) and (G), Platt says those simply are not tethered to the state's claimed interest in preserving judicial impartiality, since candidates who lose, withdraw, or die will not become judges. Platt takes particular aim at Rule 4.4(G), which prohibits a campaign committee from soliciting or accepting contributions 120 days after her death. How, Platt asks, can such a rule further the state's interest in preserving judicial integrity when that one-time candidate— now dead—can never become a sitting judge?

A clever blow by Platt, it still fails to score a knockout. As an initial matter, the argument has purchase only with respect to dead candidates, not those who lose or withdraw, since if mere election-losers (rather than life-losers) were permitted to continue fundraising longer than the victor, the Rules could create an unfair fight the next time around. But even as

applied to the campaign committees of deceased one-time candidates, Rule 4.4(G) raises no constitutional red flags.

For starters, it is hard to fathom how limiting a dead candidate's ability to fundraise implicates the First Amendment at all. Fundraising at that point is no longer political speech, given that the individual running for office can no longer speak, yet alone run for office. Indeed, what legitimate interest (aside from paying down campaign debts) would a dead candidate's committee have in continuing to fundraise long after they have lost their horse in the race? Thus, even if Platt were right that the government has a less compelling interest in regulating the fundraising activities of dead candidates, surely it must also be true that such fundraising enjoys less constitutional protection. But even accepting the dubious proposition that a dead candidate's ability to fundraise implicates core First Amendment concerns, Ohio still has a powerful interest in maintaining the *appearance* of judicial impartiality, and Rule 4.4(G) is appropriately tailored to that interest. While the dead candidate will never serve as a judge, if his committee were permitted to continue fundraising, long before and long after an election has passed, the public could be left with the impression that judges campaign like any other Ohio politician. The candidate-turned-decedent's personal interest may be extinguished, but the state's interest in tightly limiting the campaigning activities of candidates' committees has not.

For these reasons, we affirm the district court's determination that Ohio's Fundraising Rules are narrowly tailored and thus survive strict scrutiny.

### b.          Rule 4.4(A)

The Solicitation Rule prohibits a judicial candidate from personally soliciting campaign contributions with three limited exceptions: A candidate may do so (1) when speaking to an audience of 20 or more people; (2) by letter form if sent by the campaign committee and contributions are directed to the committee; and (3) by email if contributions are directed to the committee.

The Board maintains that Rule 4.4(A) is narrowly tailored to serve the state's compelling interest in maintaining actual and perceived judicial impartiality. It does so, the Board says, by targeting "the aspect of fund raising that is most apt to raise eyebrows and hackles," while still

"allow[ing] [candidates] adequate opportunity to fund their campaigns." *See Ohio Council 8 Am. Fed'n of State, Cty., & Mun. Employees, AFL-CIO v. Brunner*, 912 F. Supp. 2d 556, 568-69 (S.D. Ohio 2012). The Board further claims that the Supreme Court's decision in *Williams-Yulee* confirms Rule 4.4(A)'s constitutionality, since *Williams-Yulee* held that a personal solicitation ban *with no exclusions* was narrowly tailored and satisfied strict scrutiny. 135 S. Ct. 1669. The district court agreed, and for good reason.

*Williams-Yulee* considered whether a provision in Florida's judicial conduct code banning judicial candidates from personal solicitation with "zero exceptions" satisfied strict scrutiny. 135 S. Ct. 1669. If that comparatively broader prohibition was properly tailored, then, Rule 4.4(A)—which does admit three limited exceptions—cannot be over-inclusive. Nor is Rule 4.4(A) under-inclusive in a manner that suggests it "does not actually advance a compelling interest." *Id.* at 1668. The exceptions allow only personal solicitation that is more depersonalized and distant; they do not allow for the "face-to-face" and "one-on-one" solicitation that poses the greatest threat to actual and perceived impartiality. *Brunner*, 912 F. Supp. 2d at 565, 568.

Platt objects that *Williams-Yulee*, involving a facial challenge, cannot answer the questions posed by this case, since Platt challenges only the application of the personal solicitation ban to non-sitting judicial candidates. But *Williams-Yulee* opined on the wisdom (or lack thereof) of election regulations that treat incumbents and aspiring judges differently. Indeed, one of the reasons the Court upheld Florida's ban was that it "applie[d] evenhandedly to all judges and judicial candidates." *Williams-Yulee*, 135 S. Ct. 1668. Were it otherwise, the Court intimated, it might raise "fatal underinclusivity concerns." *Id.* This suggests that exempting non-sitting judicial candidates from Rule 4.4(A)'s solicitation prohibition would raise constitutional questions, not resolve them.

But even considering Platt's as-applied argument on its merits, it fails. Platt's theory is that applying the ban to non-sitting judicial candidates does not serve Ohio's interest in maintaining judicial integrity since the Ohio Supreme Court has declared that it "presume[s] . . . that judges are able to set aside any partisan interests once they have assumed judicial office and have taken an oath to decide cases on the facts and the law before them." *In re Disqualification*

*of Bryant*, 885 N.E.2d 246, 246 (Ohio 2006).  In light of that presumption, Platt's theory goes, judicial candidates need not be regulated, since they can easily cast aside any biases they incurred while seeking election.  This cannot be right.  For one thing, the argument overlooks the possibility that, as the Board argues, the Ohio Supreme Court can indulge such a presumption "precisely *because* Ohio reasonably regulates the solicitation of money and other campaign activities."  And for another, Platt's theory calls into question only whether the Rule's application to aspiring judges serves the state's interest in *actual* impartiality rather than the public's *perception* of impartiality.  Applying the personal solicitation ban to anyone who may become a judge serves that latter interest.

Ohio's Solicitation Rule is thus narrowly tailored to serve a compelling state interest.

### c.        Rules 4.1(A)(2) and 4.1(A)(3)

The Endorsement Rules[12] prohibit judicial candidates from two forms of partisan political speech: "mak[ing] speeches on behalf of a *political party* or another candidate for public office," Rule 4.1(A)(2), and "publicly endors[ing] or oppos[ing] a candidate for another public office," Rule 4.1(A)(3).[13]

The Board maintains that Rule 4.1(A)(2) serves the state's interest in protecting judicial integrity by preventing judicial candidates from "effectively assum[ing] the role of party spokesperson or representative," which would erode "the reality and appearance of judicial independence and impartiality."  Rule 4.1(A)(3), meanwhile, prevents judicial candidates from engaging in the quid pro quo trading of endorsements that might compromise (or appear to

---

[12]Again, we note that rules like these are common throughout the Sixth Circuit.  All other states have very similar non-endorsement rules.  Kentucky's is identical.  Kentucky Code of Judicial Conduct, Canon 5(A)(1)(c).  Michigan prohibits endorsements of any "candidate for nonjudicial office."  Michigan Code of Judicial Conduct, Canon 7(A)(1)(b).  Tennessee prohibits endorsement of "candidate[s] for any public office."  Tennessee Code of Judicial Conduct, Canon 4, Rule 4.1(A)(3).  Michigan and Tennessee also have analogous "on behalf of" prohibitions.  Michigan prohibits any speech "on behalf of a political party or nonjudicial candidate."  Michigan Code of Judicial Conduct, Canon 7(A)(1)(b).  And Tennessee prohibits any speech "on behalf of a political organization."  Tennessee Code of Judicial Conduct, Canon 4, Rule 4.1(A)(2).  That such rules are common does not mean they are constitutional, but it does show broad consensus among the states that they pass muster—and that Ohio is not picking on judicial candidates any differently than other states.

[13]Importantly, the words "another public office" mean that judicial candidates are barred only from endorsing or opposing candidates in other election battles, not their own—they remain free to "endorse" themselves and to campaign against their opponent(s).

compromise) their independence on the bench.  The district court upheld the Endorsement Rules without much analysis.  For the reasons that follow, we affirm.

Platt's challenge to Rule 4.1(A)(3) is foreclosed by our decision in *Winter*.  In that case, we assessed whether Kentucky's judicial conduct code prohibiting judicial candidates from "publicly endorsing or opposing a candidate for public office" was constitutional.  834 F.3d at 691 (alteration and citation omitted).  The answer was yes.  "Because endorsements often are exchanged between political actors on a quid pro quo basis, the endorsements clause is narrowly tailored to Kentucky's compelling interest in preventing judges from becoming (or being perceived as becoming) part of partisan political machines."  *Id.*  We held that Kentucky's ban "keep[s] its judges above the partisan fray of trading political favors" and prevents "a judge's entry into the political arena on behalf of his partisan comrades."  *Id.* (internal quotation and citation omitted).  Because Rule 4.1(A)(3)'s ban on endorsements is no different from Kentucky's, the same result obtains: it is constitutional.  And though *Winter* said little about the rule's prohibition on "opposing" a candidate (versus endorsing one), the same logic applies: acting as a political comrade's attack dog implicates a judicial candidate in partisan horse-trading every bit as much as does endorsing her.

Platt's challenge to Rule 4.1(A)(2) presents a closer question.  While *Winter* did not address the precise prohibition in Rule 4.1(A)(2)—speeches on behalf of parties or candidates— its reasoning is just as applicable.  For if the concern served by the prohibition on endorsements is "preventing judges from becoming (or being perceived as becoming) part of partisan political machines," *id.*, it is hard to imagine what might create that perception *more* than serving as a party's or candidate's spokesperson.  *Garner's Dictionary of Legal Usage* 106 (2011) (explaining that "on behalf of" means "as the agent of, as representative of").  That is why the Ninth Circuit upheld Arizona's ban on endorsements *and* speeches on behalf of political parties or candidates.  *Wolfson*, 811 F.3d at 1179.  Considering both prohibitions together, the court said: "When a judicial candidate actively engages in political campaigns, a judge's impartiality can be put into question, and the public can lose faith in the judiciary's ability to abide by the law and not make decisions along political lines."  *Id.* at 1184.  *Wolfson* is persuasive.  It is premised on the "intuitive" understanding that a judicial candidate who assumes the role of a partisan

cheerleader risks betraying public trust just as much as one who endorses another candidate for public office. *See Williams-Yulee*, 135 S. Ct. at 1666.

Nor does 4.1(A)(2) proscribe too much: candidates still enjoy their "First Amendment right to speak in support of their campaigns," *id.* at 1673, including by "explaining what makes them qualified for that office," *Winter*, 834 F.3d at 690. And it is different from the Kentucky provision struck down in *Winter* prohibiting "speeches for or against a political organization or candidate" because it bars only speeches made "on behalf of" political parties or candidates. *Id.* While this may strike some as a thin distinction, it is the same one we drew in *Winter* when explaining why we reached a different result than the Ninth Circuit did in *Wolfson* or the Seventh Circuit did in *Bauer v. Shepard*, 620 F.3d 704, 711 (7th Cir. 2010), both of which upheld an identical "on behalf of" provision. Critically, the court in *Winter* believed the Kentucky for-or-against rule might impermissibly "prevent judicial candidates from announcing their views on disputed legal and political subjects," 834 F.3d 681 (quoting *Wolfson*, 811 F.3d at 1185), while a rule prohibiting only speeches made on behalf of a party or candidate—like that at issue in *Bauer*, *Wolfson*, and this case—would not. That distinction makes a difference. Ohio's rule, unlike Kentucky's, explicitly addresses itself to endorsement-type behavior, the sort of speech that makes one look like "part of partisan political machines." *Winter*, 834 F.3d at 691. As such, it is narrowly drawn to advance Ohio's compelling interest in protecting judicial independence in practice and perception.

Platt's remaining argument against the Endorsement Rules is unpersuasive. Platt contends that whatever interest the Endorsement Rules might serve with respect to *sitting* judges, they do not serve the same interest when applied to *aspiring* judges. This argument is again premised on the Ohio Supreme Court's presumption that judges, once elected, are able to adjudicate cases impartially, free of any biases that partisan campaigning may have engendered. *See, e.g.*, *In re Disqualification of Bryant*, 885 N.E.2d at 246. If that is the case, Platt says, then Ohio need not worry about the degree to which non-sitting candidates enter the partisan fray. But *Winter* included a non-sitting judge challenger, and its analysis of Kentucky's endorsement rules did not distinguish between judges and aspiring judges. 834 F.3d at 686. And even without reference to *Winter*, we would reject Platt's argument for the same reasons outlined

earlier: the application of the Endorsement Rules to *all* judicial candidates—incumbents or not—serves to maintain the appearance of impartiality and makes possible the presumption discussed in *Bryant* that Ohio judges can set aside partisan influences and decide cases without bias.

Therefore, Ohio's Endorsement Rules are constitutional. While Platt's challenges are not without some force, the Board has carried its burden to show the rules are narrowly tailored to advance a compelling interest. And even if Platt has done enough at times to suggest a more desirable alternative—and even if we three judges might craft certain rules differently—Ohio's "considered judgments deserve our respect, especially because they reflect sensitive choices by States in an area central to their own governance—how to select those who sit as their judges." *Williams-Yulee*, 135 S. Ct. 1671 (internal quotation marks omitted).

### E.      Equal Protection

Platt contends that Rule 4.4(E) violates the Fourteenth Amendment's equal protection clause because it "favors and allows political speech on behalf of a sitting member of the judiciary while the committee supporting the non-sitting judicial candidate must remain silent." He argues that because an incumbent can hold onto money raised during any of his previous campaigns, a first-time challenger without those carry-over funds is at a disadvantage—he is limited only to those funds he can raise during Rule 4.4(E)'s prescribed timeframe, from 120 days before the primary until 120 days after the general election.[14] The district court disagreed, relying on the Sixth Circuit's *O'Toole* decision denying the plaintiffs' request for a preliminary injunction, which held that candidates' actions, not the rule itself, accounted for fundraising advantages or disadvantages. *O'Toole*, 802 F.3d at 791. We agree and affirm.

As *O'Toole* held and the Board insists, any fundraising advantage an incumbent enjoys over a first-time challenger is not *caused* by Rule 4.4(E). Those limitations, which govern only when a candidate may permissibly solicit and receive contributions, do not inexorably advantage

---

[14]Platt is an odd person to complain about the hardship Rule 4.4(E) allegedly imposes on first-time candidates, given that he has had three full election cycles since he filed this lawsuit, during each of which he could have been raising and retaining funds. Instead, Platt has raised *no* money to date. In 2013, when Platt first filed suit, he truly was a first-time candidate facing a potential fundraising disparity beyond his control; now, the calculus is different—any financial disparity is largely of his own making.

incumbents over first-time candidates. Rather, "the complained-of differential effect arises . . . from how different candidates have acquired, used, and husbanded their resources in previous campaigns." *Id.* For instance, an incumbent seeking re-election who spent all money raised during his first campaign on his campaign expenses would be in no better financial position than a hypothetical first-time challenger. And though the rule may afford incumbents the *opportunity* to gain a fundraising edge over those who have not waged prior campaigns, this hardship should not be overstated: there is nothing to prevent candidates like Platt from raising money in successive election cycles, saving much of it, and concentrating their resources in one particular race.

Even assuming some prudent incumbents will save wisely and leverage their prior-campaign war-chests in seeking re-election, amending Rule 4.4(E) to level the playing field would actually tilt it in the opposite direction. Considering a related argument—that the political activity of judicial candidates should be less restricted than that of sitting judges to "level the playing field"— the Ninth Circuit wisely rejected it:

> [S]tricter restrictions during judicial campaigns on nonjudicial endorsement and campaigning for sitting judges than for nonincumbent candidates for judicial positions would *create* the disparity, not level it. . . . The inequity of allowing some candidates for judicial office but not others those opportunities . . . seem sufficiently compelling to justify parallel restrictions for sitting judges and nonjudges, when both are running for the same judicial office.

*Wolfson*, 811 F.3d at 1191 (Berzon, J., concurring).

The same is true here. If Rule 4.4(E) allowed first-time challengers to solicit contributions more freely during the campaign cycle than incumbents, especially where the incumbent exhausted his prior fundraising in getting himself elected in the first place, then Rule 4.4(E) would actually *cause* fundraising inequalities. And rather than raising the challenge that Platt does today, incumbents would bring one claiming Ohio has impermissibly infringed on *their* right to equal protection under the law. What is more, exempting non-sitting judicial candidates from the rules would give rise to serious under-inclusivity concerns in the First Amendment context. It would be difficult indeed to justify the rules' application to incumbent candidates as being necessary to advance the state's interest in protecting judicial impartiality

while allowing non-sitting candidates to solicit, fundraise, and campaign unencumbered. Either the state's interest justifies limitations on *every* judicial candidate, or it justifies restrictions on *no* candidate. It becomes obvious, then, that the logical conclusion of Platt's so-called "as-applied" theory would be the gutting of the Code altogether.[15] We decline Platt's invitation to start that chain reaction today.

Finally, there remains Platt's suggestion that Rule 4.4(E)'s equal protection problems would vanish if the state "tied [the rule] to the requirement that all judicial candidates—those currently sitting judges and their challengers, start this fundraising period on an even keel with no carry over funds." If the state did this, Platt seems to suggest, the fundraising limitations would be aboveboard.

Two problems with Platt's theory arise. First, we have some doubt whether a state can constitutionally require all judicial candidates to disgorge the fruits of their fundraising—thereby severely limiting their ability to speak—in the name of leveling the playing field.[16] *See Buckley*, 424 U.S. at 19 (noting that spending campaign funds equates to political speech). Such overt "equalizing" attempts run headlong into the Supreme Court's rule that speech cannot be suppressed to ensure that candidates start at the same place. "No matter how desirable it may seem, it is not an acceptable governmental objective to level the playing field, or to level electoral opportunities, or to equalize the financial resources of candidates. The First Amendment prohibits such legislative attempts to fine-tune the electoral process, no matter how well intentioned." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1450 (2014) (internal citations and quotation marks omitted); *see Davis v. Fed. Election Comm'n*, 554 U.S. 724, 741 (2008) (desire to "level electoral opportunities for candidates of different personal wealth" is not a "legitimate governmental objective" that justifies speech restrictions). Yet that is exactly what

---

[15]Indeed, Platt's counsel believes the timing limitations are unconstitutional, regardless of whom they are applied to. Asked at oral argument whether there are constitutionally adequate justifications for applying the timing limitations to sitting judges, Platt's counsel responded: "Personally, I don't believe that there are." Moreover, he is the same counsel in the companion to this case, *O'Toole*, in which an *incumbent* brings a facial challenge to Rule 4.4(E).

[16]Whether a state might impose such a disgorgement requirement in service of other objectives—such as maintaining judicial integrity, preventing corruption, and preserving the public's trust in judicial independence—is another matter entirely.

Platt's no-carryover, or "disgorgement," rule would do.  "[B]y prohibiting candidates from spending money raised in one election cycle on speech in the next, [such a] disgorgement provision [would] act[] as an indirect burden on expenditures and thus implicate[] First Amendment rights." *Zimmerman v. City of Austin, Texas*, 881 F.3d 378, 395 (5th Cir. 2018). The upshot of cases like *McCutcheon*, *Davis*, and *Zimmerman* is clear: States should be hesitant to tread on the First Amendment in order to honor the Fourteenth.

And second, even if Ohio prohibited the use of carryover funds in the hope of mitigating Rule 4.4(E)'s alleged equal protection problem, why would that be enough?  If Ohio's election laws must be reformed to foster a fair fight, shouldn't the state also forbid candidates from using their personal wealth to fund campaigns?  And even once financing disparities are eliminated, oughtn't Ohio enact rules to eliminate the other natural advantages of incumbency—say, perhaps, a rule barring sitting judges from campaign speech throughout their tenure, thereby limiting their ability to capitalize on their name-recognition, service record, and reputation? Such rules might further level the playing field between incumbents and challengers, but in so doing would spawn fresh First Amendment quandaries.  Already wary of beginning a game of constitutional whack-a-mole, our inability to discern a limiting principle in Platt's position provides another reason to reject it.

Therefore, we affirm the district court's grant of summary judgment against Platt's equal protection claim.  Rule 4.4(E) is constitutional.

**III**

Our decision to uphold Ohio's regulations may strike some as antithetical to core First Amendment principles.  And indeed, if the strictures of Canon 4 were imported into the legislative election context, we have little doubt they would engender far graver constitutional concerns.  But judicial elections fundamentally alter the constitutional calculus.  We demand independence from our judges; we may expect just the opposite from our politicians. *Williams-Yulee*, 135 S. Ct. at 1667.  If judicial candidates were permitted to fundraise and campaign unfettered, the specter of actual corruption would loom large, and the erosion of public trust in the judiciary larger still.

This is not to suggest, however, that states can regulate judicial elections however they like. We recognize that a state cannot constitutionally force its judges to submit to the crucible of public elections while at the same time prohibiting them from running an effective campaign. The "First Amendment does not permit" states to "leav[e] the principle of elections in place while preventing candidates from discussing what the elections are about." *White*, 536 U.S. at 788. Rather, in their efforts to insulate the judiciary from the most corrosive elements of partisan politics, states must find the permissible space between those two poles.

All we hold today is that Ohio's rules toe that constitutional tightrope. The district court's grant of summary judgment in favor of the Board is therefore **AFFIRMED**.