RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

NEW LANSING GARDENS HOUSING LIMITED
PARTNERSHIP,

*Plaintiff-Appellant*,

*v.*

COLUMBUS METROPOLITAN HOUSING AUTHORITY;
ASSISTED HOUSING SERVICES CORPORATION,

*Defendants-Appellees*.

┐
│
│
│
│
│ ⟩ No. 21-3942
│
│
│
│
│
┘

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-02475—Michael H. Watson, District Judge.

Argued: June 9, 2022

Decided and Filed: August 24, 2022

Before: MOORE, STRANCH, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Michael R. Shebelskie, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Appellant. Loriann E. Fuhrer, KEGLER BROWN HILL + RITTER, Columbus, Ohio, for Appellees. **ON BRIEF:** Michael R. Shebelskie, J. Pierce Lamberson, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Appellant. Loriann E. Fuhrer, KEGLER BROWN HILL + RITTER, Columbus, Ohio, for Appellees.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.    The U.S. Department of Housing and Urban Development (HUD) oversees the Section 8 low-income housing assistance program.    Owner New Lansing renewed its Section 8 contract with Columbus Metropolitan Housing Authority in 2014.    In 2019, at the contractual time for its fifth-year rent adjustment, New Lansing submitted a rent comparability study (RCS) to assist CM Authority in determining the new contract rents. Following the 2017 HUD Section 8 Guidebook, CM Authority forwarded New Lansing's RCS to HUD, which obtained an independent RCS.    Based on the independent RCS undertaken pursuant to HUD's Guidebook requirements, the Housing Authority lowered New Lansing's contract rents amount.    New Lansing sued for breach of contract and declaratory judgment.    The district court granted the Defendants' Motion to Dismiss.    For the reasons that follow, we **AFFIRM**.

## I.  BACKGROUND

### A.  Section 8 Contracts

The Section 8 low-income housing assistance program is governed by 42 U.S.C. § 1437f, which is part of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 8, 88 Stat. 633, 662, that was later amended by the Multifamily Assisted Housing Reform and Affordability Act of 1997 (MAHRA).[1]  The Section 8 program's purpose is to "aid[] low-income families in obtaining a decent place to live and [to] promot[e] economically mixed housing." 42 U.S.C. § 1437f(a).

Through the Section 8 program, HUD gives rent subsidies to qualified low-income families who rent from property owners that participate in the program.  *Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 369 (6th Cir. 2007). HUD authorizes state or local governmental entities, called "public housing authorities" (PHA), to administer the program.  *Caswell v. City of Detroit Hous. Comm'n*, 418 F.3d 615, 617 (6th

———————————

[1]This opinion also refers to the 1999 amendments of MAHRA, which are codified at 42 U.S.C. § 1437f note.

Cir. 2005). Section 8 permits HUD to enter into agreements with PHAs called "annual contributions contracts." 42 U.S.C. § 1437f(b)(1). In turn, the annual contributions contracts between the PHAs and HUD allow the PHAs to "enter into contracts to make assistance payments to owners of existing dwelling units." *Id.* The annual contributions contracts require the PHAs to comply with HUD requirements that are in effect when discharging their obligations under the Section 8 program.

The subsequent contract between the PHA and the Section 8 property owner is called a Housing Assistance Payment Contract (HAP Contract). The HAP Contract provides for owner duties that are consistent with the Section 8 regulations and sets the monthly rent that the owner is entitled to receive—known as "contract rents." *Wade v. Cuyahoga Metro. Hous. Auth.*, 134 F.3d 373, 1998 WL 24991, at *1 n.1 (6th Cir. 1998) (unpublished table decision); 42 U.S.C. § 1437f(c)(1)(A). In turn, the arrangement allows the PHAs to act as contract administrators, i.e., they become "responsible for monitoring performance by the owner." 24 C.F.R. § 880.201.

The rent subsidy payments that PHAs make on behalf of low-income renters are called "housing assistance payments." *Cuyahoga Metro. Hous. Auth. v. K & D Grp., Inc.*, 618 F. App'x 842, 844 (6th Cir. 2015). Those payments go directly to Section 8 property owners for rent, and the low-income families pay rent based on their income. *Id.* HUD reimburses the PHA for the payments it makes to Section 8 property owners. *One & Ken Valley Hous. Grp. v. Maine State Hous. Auth.*, 716 F.3d 218, 219–20 (1st Cir. 2013). Based on HUD guidelines, the payments from the PHAs to the property owner are adjusted periodically. *Id.* at 220.

Congress became concerned over time that "a substantial number of housing units receiving project-based assistance have rents that are higher than the rents of comparable, unassisted rental units in the same housing rental market." MAHRA, § 511(a)(5). As a result, it enacted MAHRA "to encourage owners of eligible multifamily housing projects to restructure their FHA-insured mortgages and project-based assistance contracts in a manner that is consistent with this [Act] before the year in which the contract expires." § 511(b)(3). While creating these incentives, Congress used MAHRA to prescribe requirements that would "preserve low-income rental housing affordability and availability while reducing the long-term costs of project-based assistance." § 511(b)(1). Because the purposes and the requirements of

MAHRA govern the Section 8 housing program and are central to this litigation, we review MAHRA's key provisions.

Section 524 of MAHRA created new policies for renewing Section 8 project-based contracts on "market rents." *See Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC*, No. 21-CV-05389-SK, 2022 WL 1493267, at *1 (N.D. Cal. May 3, 2022). Section 524(a)(5) of MAHRA provides that HUD "shall prescribe the method for determining comparable market rent by comparison with rents charged for comparable properties." MAHRA, Pub. L. No. 105-65, 111 Stat. 1344 (1997) (as amended by Pub. L. No. 106-74, 113 Stat. 1074, 1109–16 (1999)) (codified at 42 U.S.C. § 1437f note). For contracts at the end of a five-year period that are renewed under § 524(a), like the one at issue here, "the Secretary shall compare existing rents with comparable market rents for the market area and may make any adjustments in the rent necessary to maintain the contract rents at a level not greater than comparable market rents or to increase rents to comparable market rents." § 524(c)(1).

The statute "does not prescribe the method the Secretary should use to compare rents"; instead, Congress granted HUD discretion to establish requirements to effectuate MAHRA, and HUD employed that discretion to issue Section 8 Renewal Guidebooks. *See* MAHRA, § 524(a)(5); *see also Hotel Oakland Assocs.*, 2022 WL 1493267, at *2. "To respond to the evolving nature of Section 8 renewal legislation and policy," HUD periodically revises the Guidebooks and makes them available online—at least three Guidebooks (2012, 2015, and 2017) have been issued during the relevant time period here. "To make Section 8 policy more effective and accessible for HUD's partners," the Guidebook "provides comprehensive guidance for renewing expiring Section 8 HAP contracts." The 2017 Guidebook states that "[t]he instructions in [it] apply to all Contract Administrators who are responsible for overseeing Section 8 HAP contracts."

As part of that guidance, the Guidebook has provided instruction on the RCS process since at least 2012, including HUD's standards for preparing, submitting, and reviewing RCSs to determine the comparable market rents. The 2017 Guidebook explains that "[t]he purpose of a Rent Comparability Study (RCS) is to estimate 'market' rents for each Section 8-unit type. 'Market Rent' is the rent that a knowledgeable tenant would most probably pay for Section 8

units . . . if the tenants were not receiving rental subsidies and rents were not restricted by HUD . . . ."

The 2017 version of the Guidebook requires HUD to obtain an independent RCS when the owner's RCS exceeds 140% of the "Median Gross Rent." According to the Guidebook, the 140% Rule comes into play when the owner's "RCS concludes that the project's median rent for the assisted units . . . exceeds 140 percent of the 'Median Gross Rent by Zip Code Tabulation Area' . . . ." This Rule impacted New Lansing's HAP Contract renewal process as described below.

## B. New Lansing's HAP Contract

New Lansing is a limited partnership that owns Lansing Gardens, an apartment complex located in Bridgeport, Ohio. Defendants are CM Authority, the PHA serving as a contract administrator for the HUD Section 8 program, and Assisted Housing Services Corporation, the authorized agent for CM Authority (collectively, the Housing Authority).

In 2014, New Lansing and the Housing Authority renewed the HAP Contract for a 20-year term. Section 5 of the Renewal Contract provides for a "fifth-year adjustment" of contract rents, which requires the Housing Authority to adjust the monthly contract rents as follows:

> (b) At the expiration of each 5-year period of the Renewal Contract term, the contract administrator shall compare existing contract rents with comparable market rents for the market area. At such anniversary of the Renewal Contract, the contract administrator shall make any adjustments in the monthly contract rents, as reasonably determined by the contract administrator in accordance with HUD requirements, necessary to set the contract rents for all unit sizes at comparable market rents. Such adjustments may result in a negative adjustment (decrease) or positive adjustment (increase) of the contract rents for one or more unit sizes.

> (c) To assist in the determination of the contract rents, the contract administrator may require that the owner submit to the contract administrator a rent comparability study (at the owner's expense) in accordance with HUD requirements.

Section 8 of the Renewal Contract addresses the effect of HUD's regulations and other requirements, which may change over time:[2]

> The Renewal Contract shall be construed and administered in accordance with all statutory requirements, and with all HUD regulations and other requirements, including amendments or changes in HUD regulations and other requirements during the term of the Renewal Contract. However, any changes in HUD regulations and requirements which are inconsistent with the provisions of the Renewal Contract, including the provisions of section 5 (contract rent) and section 10 (distributions), shall not be applicable.

At the time the 2014 Renewal Contract was signed, the 2012 Section 8 Policy Guidebook was in effect. The next year, HUD issued the 2015 Guidebook, which introduced the "140% Rule" that remained in the 2017 Guidebook. The 2017 Guidebook, published on June 30, 2017, states "[t]his guidance will apply to renewal and amend rent packages received by the Department (or post-marked) July 28, 2017 or later." The Amended Complaint (herein "Complaint") takes issue with the Housing Authority's application of the 140% Rule in the 2017 Guidebook.

According to the 2017 Guidebook, if a HUD-commissioned RCS is required and differs from the owner's RCS, then "HUD will compare the gross rent potential for the subject project as determined by the HUD-commissioned RCS versus the owner-contracted RCS, and the final market rent for the subject project will be determined" as required by the Guidebook. "When the HUD comparable gross rent potential is greater than the owner's comparable gross rent potential, the final comparable market rents will be the owner's comparable market rents." But, according to Chapter 9 of the Guidebook, the analysis changes when the HUD comparable gross rent potential is *less* than the owner's comparable gross rent potential:

---

[2]A PHA has a duty to "comply with HUD regulations and other HUD requirements." 24 C.F.R. § 982.52(a). "HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives." *Id.*; *see also* Request for Proposals; Contract Administrators for Project-Based Section 8 Housing Assistance Project (HAP) Contracts, 64 Fed. Reg. 27358, 27360 (May 19, 1999) ("In addition to publication in the Federal Register and the CFR, HUD issues additional program requirements as HUD 'directives', including HUD notices, handbooks and forms."). The regulations define comparable market rents as "rents determined in accordance with section 524(a)(5) of MAHRA and HUD's instructions." 24 C.F.R. § 402.2(c).

When the HUD comparable gross rent potential is less than the owner's comparable gross rent potential, the final comparable market rents will be determined by reviewing if the owner's comparable rent potential is:

i.     less than 105 percent of the HUD comparable rent potential, and if so, the final comparable market rents will be the owner comparable market rents; or

ii.    greater than or equal to 105 percent of the HUD comparable rent potential, in which case the final comparable market rents will be 105 percent of the market rents as determined by the HUD-commissioned RCS.

Chapter 9 of the Guidebook also addresses any disagreement an owner may have with the HUD-commissioned RCS:

Transparency:  The owner can request a copy of the HUD-commissioned RCS for information purposes only.  There are no negotiations allowed nor is there an appeal process for differences between the two RCSs.  However, if the owner identifies factual discrepancies, such as errors in square footage or computational errors that contribute to a large discrepancy in concluded rents, then the owner may notify HUD and HUD will review such discrepancies.  For other issues, such as choice of comparables, amount of adjustments or derivation of concluded rent, the HUD-commissioned RCS will prevail, and cannot be appealed or questioned by the owner."

In 2019, five years into the Renewal Contract, New Lansing submitted an RCS to the Housing Authority that sought to increase the contract rents amount.  The Housing Authority determined that the study triggered the 140% Rule and submitted the study to HUD for approval. HUD obtained an independent RCS, and the Housing Authority subsequently issued a new rent schedule to New Lansing in which the new contract rents were lower than those in place before the initiation of the fifth-year adjustment process.  New Lansing unsuccessfully protested to the Housing Authority and HUD about the new contract rents and HUD's RCS.

## C.  Procedural Background

New Lansing sued the Housing Authority, alleging breach of contract and requesting a declaratory judgment and injunctive relief.  In its Complaint, New Lansing contends that the Housing Authority acted in bad faith and breached Sections 5 and 8 of the Contract when it enforced HUD's RCS and applied the 140% Rule, which New Lansing contends is inconsistent

with the Contract.  The Housing Authority moved to dismiss the case for failure to state a claim and for failure to join HUD as a necessary party.

The district court dismissed the case, reasoning that the complaint did not plausibly allege a breach of contract claim, and it denied New Lansing's declaratory judgment request. Addressing arguments that the Housing Authority acted in bad faith, the court determined that, assuming a claim of bad faith had been asserted, it must be dismissed because Ohio law does not recognize a bad faith claim in this situation.  And if New Lansing intended to allege that the Housing Authority breached the duty of good faith and fair dealing, the court held that the claim must be dismissed because it is not an independent cause of action.

Before that dismissal, the United States, a nonparty, filed a statement of interest under 28 U.S.C. § 517, though it maintained it should not be made a party to the case.  The district court reviewed the Government's statement but disposed of the case based on the parties' briefing.  Though some documents were attached to the Housing Authority's motion, the court also declined to convert the motion to dismiss into one for summary judgment.  In granting dismissal, the court considered only the allegations in New Lansing's Complaint and its Renewal Contract exhibit; it did not consider other exhibits and declined to grant New Lansing permission to file supplemental exhibits.  New Lansing timely appealed.

## II.  STANDARD OF REVIEW

We review a district court's grant of a motion to dismiss de novo.  *Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707 (6th Cir. 2021).  Construing the complaint in the light most favorable to New Lansing, we "accept all well-pleaded factual allegations as true," and determine whether the complaint sufficiently states "a claim to relief that is plausible on its face."  *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.  DISCUSSION

On appeal, New Lansing argues that the Housing Authority breached the Renewal Contract by determining the adjusted contract rents using HUD's 140% Rule, which New

Lansing contends is inconsistent with Section 5 of the Contract.  New Lansing also presents two arguments expanding its presentation to the district court:  it now argues that the 2017 Guidebook applies only to contracts renewed after July 28, 2017 and that none of the Guidebooks are incorporated into the Renewal Contract.**3**  We address each argument in turn.

### A.  Ohio Contract Law

The parties agree that Ohio law applies.  An Ohio breach of contract claim has four elements:  "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff."  *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (quoting *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio Ct. App. 2007)).  A breach consists of "fail[ure] to perform according to the terms of the contract or act[ing] in a manner that is contrary to its provisions."  *Id.*

Interpreting written contract terms, including whether those terms are ambiguous, is a matter of law to be determined by the court.  *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019).  Because Ohio courts presume that the intent of the parties "reside[s] in the language they choose to use in their agreement," the court must ascertain and apply the intent of the parties as evidenced by the language in the contract.  *Savedoff*, 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)).  Thus, Ohio courts generally give common words their ordinary meaning and technical terms their technical meaning, "unless a different intention is clearly expressed."  *In Re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d at 276 (quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997)).

If the contract terms are not ambiguous, courts apply the plain language of the contract.  *Savedoff*, 524 F.3d at 763.  But when contractual language "'is unclear, indefinite, and reasonably subject to dual interpretations or is of such doubtful meaning that reasonable minds could disagree as to its meaning,' then it is ambiguous as a matter of law."  *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d at 276 (quoting *Cadle v. D'Amico*, 66 N.E.3d 1184,

---

**3**Contradicting its allegations in the Complaint, New Lansing now argues that no Guidebooks are incorporated into the Renewal Contract regardless of their year.

1188 (Ohio Ct. App. 2016)).  Under Ohio law, the meaning of the contract becomes "a question of fact" when an ambiguity exists.  *Id.* (quoting *Books A Million, Inc. v. H & N Enters., Inc.*, 140 F. Supp. 2d 846, 854 (S.D. Ohio 2001)).

## B.  The Relevance of the Guidebooks

New Lansing advances two arguments to support its claim that the Guidebooks have no relevance to the Renewal Contract.  First, it contends that the 2017 Guidebook "is facially limited to contracts that post-date its issuance."  Relatedly, it asserts that the Renewal Contract does not incorporate any version of the Guidebook.  As did the district court, we examine the language of the Guidebooks because the Complaint references and quotes the Guidebooks and the parties' arguments hinge on their analysis of the Guidebooks.  *See Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011).

Regarding its date of issuance argument, New Lansing points out that the 2017 Guidebook was effective July 28, 2017, whereas the parties entered the Renewal Contract on November 1, 2014.  The Housing Authority responds that the plain language of the 2017 Guidebook establishes its applicability to the full 20-year term of the Renewal Contract.

The motion to dismiss is governed by the Renewal Contract's language, the Guidebook, and the allegations in the Complaint.  Section 8 of the Contract states:

> The Renewal Contract shall be construed and administered in accordance with all statutory requirements, and with all HUD regulations and other requirements, including amendments or changes in HUD regulations and other requirements during the term of the Renewal Contract.  However, any changes in HUD regulations and requirements which are inconsistent with the provisions of the Renewal Contract, including the provisions of Section 5 (contract rent) and Section 10 (distributions), shall not be applicable.

New Lansing argues that the 2017 Guidebook is not a HUD "requirement" within the meaning of Section 8 of the Contract because, by its own terms, the 2017 Guidebook does not purport to apply to contracts executed before July 2017.  But New Lansing ignores the rest of the Guidebook's applicability clause, which also applies to "amend rent packages received by the Department (or post-marked) on or after July 28, 2017."  An "amend rent package[]," although not specifically defined in the Guidebook, most naturally refers to documents pertaining to a

change in contract rents, which describes just what New Lansing submitted—after July 28, 2017—during the fifth-year adjustment process. The plain language of the Guidebook applies to New Lansing's efforts in 2019 to make a fifth-year adjustment that would increase its rents effective November 1, 2019.

Notably, New Lansing acknowledged in its Complaint that the 2017 Guidebook is "a subsequent HUD requirement." The 2017 Guidebook is a *change* in HUD *requirements* that was contemplated by Section 8 of the Renewal Contract and applies to the parties' contractual arrangement unless, per Section 8, it is "inconsistent" with some other provision of the Renewal Contract. Thus, New Lansing's claims that the 2017 Guidebook does not apply to the fifth-year adjustments required in its 2014 Renewal Contract is disproven by the mechanics of the Section 8 program, the plain language of the Renewal Contract and the Guidebook, and the allegations of New Lansing's Complaint.

New Lansing now also asserts that the Guidebooks cannot apply because the Renewal Contract does not incorporate any version of the Guidebook. To incorporate a document by reference in Ohio, "the contract must make clear reference to the document and describe it in such terms that its identity may be ascertained beyond a doubt." *84 Lumber Co., LP v. Thompson Thrift Constr., Inc.*, No. 2:15-CV-1052, 2018 WL 3583227, at *5 (S.D. Ohio July 26, 2018) (citing *Volovetz v. Tremco Barrier Sols., Inc.*, 74 N.E.3d 743, 751 (Ohio Ct. App. 10th Dist. 2016)).

Here, Section 8 of the Contract specifically references HUD requirements and includes changes in those requirements during the term of the Contract, unless those changes are inconsistent with the provisions of the Renewal Contract. A "requirement" is simply "something called for or demanded; a condition which must be complied with." *Requirement*, Oxford English Dictionary (3d ed. 2010), https://www.oed.com/view/Entry/163260. As explained above, the 2017 Guidebook fits this bill. Contract administrators are "required to follow the Guidebook," including the "special procedures" outlined in the 140% Rule. We are satisfied, given the plain language of the Contract and its context, that the generally applicable Guidebooks, issued under the authority Congress granted to HUD and the obligations it imposed in MAHRA, qualify as a "requirement." The Contract, moreover, was entered under the Section

8 program and must be interpreted in accordance with the context and obligations of MAHRA in mind, including the discretion Congress granted HUD when requiring HUD to prescribe a method for determining comparable market rent. *See, e.g.*, *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, 33 F.4th 872, 880 (6th Cir. 2022) ("The [Limited Partnership Agreement] and its relevant provisions, therefore, must be understood in the context of the [Low-Income Housing Tax Credit] program."). The Renewal Contract therefore incorporates these obligations unless they are inconsistent with its other provisions. Accordingly, the key issue here is whether the 2017 Guidebook is inconsistent with other provisions of the Renewal Contract.

### C.  The 140% Rule and Section 8 of the Renewal Contract

New Lansing challenges the district court's determination that the 140% Rule is consistent with the Contract, contending that the Rule conflicts with and thereby prevents the Housing Authority from complying with its duties under the Contract. Given those inconsistencies, New Lansing argues, the Guidebook is inapplicable to the Renewal Contract under Section 8, which specifies that "any changes in HUD regulations and requirements which are inconsistent with the provisions of the Renewal Contract . . . shall not be applicable."

According to the 2017 Guidebook, the 140% Rule becomes relevant when the owner's "RCS concludes that the project's median rent for the assisted units . . . exceeds 140 percent of the 'Median Gross Rent by Zip Code Tabulation Area . . . .'" As explained above, when HUD's rent potential determination is greater than the owner's, the final "rents will be the owner's comparable market rents." But when HUD's comparable rents determination is less than the owner's, the Guidebook provides a formula which can result in the final rents being set based on "the market rents as determined by the HUD-commissioned RCS."

New Lansing argues that these requirements are at odds with the Housing Authority's duties under the Contract. It contends that such rules are inconsistent with Section 5 of the Renewal Contract, which requires the Housing Authority to adjust the monthly contract rents by using comparable market rents:

(b) At the expiration of each 5-year period of the Renewal Contract term, the contract administrator shall compare existing contract rents with comparable market rents for the market area.  At such anniversary of the Renewal Contract, the contract administrator shall make any adjustments in the monthly contract rents, as reasonably determined by the contract administrator in accordance with HUD requirements, necessary to set the contract rents for all unit sizes at comparable market rents. Such adjustments may result in a negative adjustment (decrease) or positive adjustment (increase) of the contract rents for one or more-unit sizes.

(c) To assist in the determination of the contract rents, the contract administrator may require that the owner submit to the contract administrator a rent comparability study (at the owner's expense) in accordance with HUD requirements.

New Lansing raises five intertwined arguments as to why the 140% Rule is inconsistent with the Renewal Contract, four of which address various ways the Rule allegedly contravenes the Housing Authority's contractual rights and obligations.  Specifically, New Lansing claims that the 140% Rule:  (1) strips the Authority of its duty under Section 5(b) "to determine the comparable market rent to be used to adjust" contract rents; (2) deprives the Housing Authority of its contractual right and duty to adjust the contract rents based on its own "comparison of comparable market rent to contract rent"; (3) caps the contract rents adjustment in violation of what it claims is a requirement of Section 5(b)—that "the adjustment be the amount necessary for the contract rent to equal comparable market rent"; and (4) "contravenes" Section 5(b)'s claimed prohibition of "any contract rent adjustment not in accordance with the Renewal Contract's terms" on the basis that the 140% Rule "materially rewrites Section 5(b) of the Renewal Contract" and "mandates rent adjustments at odds with Section 5(b)."

These arguments overlook the relationship between, and the respective roles of, the Housing Authority and HUD, as set out in the Renewal Contract and as required under MAHRA and the mechanics of the Section 8 program.  The Housing Authority's contractual duty is to "compare existing contract rents with comparable market rents for the market area."  Critically, Section 5 of the Renewal Contract does not include a specific process for the Housing Authority to use in calculating market rents.  Rather, in adjusting contract rents to equal market rents, the Authority is obliged to "reasonably determine" the adjustments "in accordance with HUD requirements."  In other words, it requires the Housing Authority to follow HUD requirements

when it compares the comparable market rents with the contract rents and when it adjusts the rents. Congress granted HUD the authority to prescribe how to determine comparable market rents. MAHRA, § 524(a)(5). The HUD requirement at issue is specified in the 2017 Guidebook, which states that "[t]he instructions in this Guide apply to all Contract Administrators who are responsible for overseeing Section 8 HAP contracts." The Renewal Contract itself, moreover, specifies that as a HUD contract administrator, the Housing Authority has an obligation to follow HUD requirements in determining the comparable market rents. The Housing Authority thus compares the current contract rents with the comparable market rents using the method promulgated and required by HUD (here, the 140% Rule). When the 140% Rule is triggered, HUD is to commission its own RCS, which factors into the comparable market rents.

Importantly, New Lansing knew when it agreed to the Renewal Contract that the Contract required the Housing Authority to adjust rents "in accordance with HUD requirements." It also knew that changes in HUD requirements would apply to the Renewal Contract unless those changes were inconsistent because the plain language of that Contract said so. As a party to the Renewal Contract, New Lansing was aware that the Housing Authority has legally binding obligations to HUD. In other words, compliance with HUD's Guidebook was part of the bargained-for exchange when New Lansing agreed to enter the Renewal Contract that was created pursuant to the Section 8 housing program.

The governing documents therefore show that the 140% Rule allows the Housing Authority to compare the contract rents with the comparable market rents; look at the comparable market rents that are determined by HUD's prescribed method and then adjust the rent so that it is set at the comparable market rents; and make the necessary adjustment to match the comparable market rents as determined by HUD's specified process—all as required by the Renewal Contract. Contract Administrators, like the Housing Authority, act in accordance with their Renewal Contracts when they compare market rents and adjust those rents per HUD requirements. Taking the Guidebook requirements and Section 5 of the Renewal Contract together, when the 140% Rule applies, the contract administrator can still make decisions and perform its duties under the Renewal Contract. Thus, there is no conflict between the Renewal Contract and the requirements of the Guidebook.

New Lansing's final argument is that 140% Rule "dispenses with the requirement" under Section 5(b) that the Housing Authority act reasonably. It contends that the Rule requires the Housing Authority "to act unreasonably" because the 140% Rule requires the Housing Authority to use the HUD-commissioned RCS, "even if, as here, that study is fraudulent." This parallels New Lansing's argument that the district court did not consider its claim that the Housing Authority "breached the Renewal Contract by reducing the contracts based on the fraudulent FRG study." New Lansing also argues that the Housing Authority acted "unreasonably" in using a "fraudulent" study, and that the HUD RCS "is fraudulent because it deliberately understates the true comparable market rents at HUD's behest." New Lansing, however, did not sue HUD.

It is unclear whether New Lansing is now attempting to add a fraud claim to its Complaint. The Complaint contains only two counts—"Breach of the Renewal Contract" and "Declaratory Judgment." New Lansing did not allege a fraud claim. To be sure, the Complaint contains several grievances about HUD's RCS such as that: HUD acted in bad faith by commissioning the RCS; the RCS contained "errors, deficiencies and manipulations"; the process was not "fair and independent"; and the RCS was "fatally defective." Based on these allegations, even if New Lansing had alleged a fraud claim, it is not clear that the claim would be permitted under Ohio Law. *See Med. Billing, Inc. v. Med. Mgmt. Scis., Inc.*, 212 F.3d 332, 338 (6th Cir. 2000) ("Ohio law goes further by requiring that fraud damages be limited to the injury actually arising from the fraud. The tort injury must be unique and separate from any injury resulting from a breach of contract.").

Perhaps New Lansing's intended claim is that the Housing Authority breached the Renewal Contract by acting unreasonably in following the 140% Rule HUD requirement. As explained above, the Renewal Contract requires only that the Housing Authority "make any adjustments in the monthly contract rents, as reasonably determined by the contract administrator in accordance with HUD requirements, necessary to set the contract rents for all unit sizes at comparable market rents." Congress gave HUD the authority to prescribe how to determine comparable market rents, the Renewal Contract adopted those requirements, and thus the Housing Authority was required to follow those HUD methods. The Housing Authority did not act unreasonably by following the 140% Rule requirement in the 2017 HUD guidance.

## IV.  CONCLUSION

Because New Lansing has failed to plausibly allege a breach of contract claim, we **AFFIRM** dismissal of its Complaint and denial of a declaratory judgment.