RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0015p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ELECTRONIC MERCHANT SYSTEMS LLC,

*Plaintiff-Appellant*,

*v.*

PETER GAAL,

*Defendant-Appellee*.

No. 22-3602

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cv-01898—Dan A. Polster, District Judge.

Decided and Filed: January 30, 2023

Before: GILMAN, McKEAGUE, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Egon P. Singerman, EGON P. SINGERMAN, ATTORNEY AT LAW, Solon, Ohio, Hunter G. Cavell, CAVELL LAW, LLC, Solon, Ohio, for Appellant. Alexander J. Durst, THE DURST LAW FIRM, Cincinnati, Ohio, for Appellee.

───────────────

## OPINION

───────────────

McKEAGUE, Circuit Judge. Plaintiff Electronic Merchant Systems LLC ("EMS") appeals the district court's dismissal, for failure to state a claim, of its complaint against Defendant Peter Gaal for breach of guaranty, unjust enrichment, and fraud. EMS argues that the district court erred in considering outside information, not granting EMS leave to amend its complaint, and finding that Gaal is not liable under a guaranty provision that he signed for debt

allegedly owed EMS by Gaal's company, Procom America LLC.  We AFFIRM in part and REVERSE in part.

## I.

### 1. Facts

EMS, an Ohio-based corporation, offers payment processing services to other companies. In April 2014, it entered into a merchant agreement (the "2014 Agreement") with non-party Procom, a business owned by Defendant Peter Gaal that sold historical tours.  Under this agreement, EMS and an associated bank provided payment processing services to Procom, in return for which Procom paid fees to EMS.

The 2014 Agreement—which was a form contract drafted by EMS—was executed by Gaal and another Procom officer, Nikoletta Montgomery, and contained a personal-guaranty provision signed by Gaal.  The guaranty provision reads:

> The undersigned . . . in consideration of BANK and EMS entering into this Merchant Agreement ("Agreement") with [Procom], hereby absolutely and unconditionally guarantee the full and prompt payment of any and all amounts owed to BANK and EMS and the performance of all MERCHANT'S obligations under this Agreement as may be subsequently amended from time to time, whether before or after termination or expiration of the Agreement. . . . This Guaranty is continuing, binding upon heirs and successors and may not be changed except in writing and signed by BANK and EMS.

R. 40-1 at PID 278.  The 2014 Agreement also contains terms relating to "chargebacks," which occurred when a Procom customer's transaction was declined or canceled after EMS had already credited Procom's account for the purchase.  Under the agreement, EMS paid the money back to the Procom customer, then in turn charged Procom for that money plus a chargeback fee.

On June 10, 2019, EMS and Procom executed a second agreement (the "2019 Agreement").  This agreement was, like the first, a form contract drafted by EMS, and it addressed the same subject as the first contract but with slightly altered terms (beneficial to EMS).  This contract contained an explicit integration clause, which reads:

> This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and

> understanding between [Procom], Bank and EMS with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written.

R. 40-2 at PID 291. The agreement contained a new guaranty provision, signed not by Gaal but by a different Procom employee, Debra Watkins.

The COVID-19 pandemic hit Procom hard. Beginning in March 2020, many Procom customers canceled their credit card purchases with Procom, resulting in, EMS claims, over $10 million in chargebacks. Some of these chargebacks related to transactions occurring prior to June 10, 2019 (the execution date of the 2019 Agreement), and some related to transactions occurring after that date. Neither Procom nor Gaal has paid EMS the money for these chargebacks.

Procom is currently involved in a Chapter 7 bankruptcy proceeding in the United States Bankruptcy Court for the Middle District of Florida. EMS filed a creditor's proof of claim in this proceeding, the accuracy of which was attested to by EMS's Chief Financial Officer under penalty of perjury.

## 2. Procedural History

On August 25, 2020, EMS instituted this action in the United States District Court for the Northern District of Ohio against Gaal,[1] and the operative complaint alleges breach of guaranty, unjust enrichment, and fraud.[2] Gaal moved to dismiss the complaint for lack of personal jurisdiction and failure to state a claim. The district court granted Gaal's motion to dismiss for failure to state a claim, and declined to analyze the personal-jurisdiction issue. It first found that the 2019 Agreement superseded the 2014 agreement "in all material respects," including replacing Gaal's guaranty provision with a new guaranty provision signed by Watkins. R. 49 at PID 426. The court then concluded that all of the chargebacks in question—which the court

---

[1]EMS also named Nikoletta Montgomery, a former Procom employee involved in the execution of the 2014 Agreement, as a party to the suit, but later voluntarily dismissed her.

[2]The district court dismissed EMS's fraud and unjust-enrichment claims, because EMS failed to respond to Gaal's arguments regarding those issues in its opposition to Gaal's motion to dismiss. EMS does not challenge that determination on appeal. Thus, only the breach of guaranty claim remains.

found occurred after the execution of the 2019 Agreement, though some related to transactions which themselves occurred before that date—arose solely under the 2019 Agreement. Because Gaal signed the guaranty provision of only the 2014 Agreement, the court concluded that he was not liable for any of the chargeback debt. In performing this analysis, the court took judicial notice of EMS's filing in the Procom bankruptcy proceeding and refused to consider an affidavit (proffered by EMS) by Daniel Moenich, an EMS employee (the "Moenich Affidavit"). EMS timely appealed.

## II.

EMS raises four issues on appeal: that the district court erred in (1) considering the bankruptcy filing and refusing to consider the Moenich Affidavit, (2) dismissing with prejudice rather than allowing EMS to amend its complaint, (3) finding that the 2019 Agreement replaced the 2014 Agreement rather than merely supplementing it, and (4) finding that all of the chargeback debt—including that relating to transactions which occurred prior to the execution of the 2019 Agreement—arose under the 2019 Agreement rather than under the 2014 Agreement. We affirm the district court on the first and third issues, decline to address the second, and reverse on the fourth, holding that, as alleged by EMS, any chargeback debt related to transactions occurring prior to the execution of the 2019 Agreement arose under the 2014 Agreement.

### 1. Standard of Review

We review de novo a district court's decision to dismiss under Rule 12(b)(6) for failure to state a claim. *Lindke v. Tomlinson*, 31 F.4th 487, 495 (6th Cir. 2022). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In analyzing a 12(b)(6) motion, the court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Taylor v City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)). However, the court does not have to accept as true "unwarranted factual inferences." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d

430, 433 (6th Cir. 2008). The burden of demonstrating that the complaint fails to adequately state a claim falls on the defendant. *Taylor*, 922 F.3d at 331.

Ohio law governs this dispute, which provides that if the terms of a contract are "clear and unambiguous, then its interpretation is a matter of law for the court." *Wilkerson v. Am. Family Ins. Co.*, 997 F.3d 666, 668 (6th Cir. 2021) (citation and internal quotation marks omitted). Where a dispute is based on the interpretation of a contract, and the contract's terms are clear, "there is no issue of fact to be determined," *Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019), and thus dismissal on 12(b)(6) grounds might be appropriate, *see Constr. Interior Sys., Inc. v. Marriott Family Rests., Inc.*, 984 F.2d 749, 754 (6th Cir. 1993); *In re Fifth Third Early Access Cash Adv. Litig.*, 925 F.3d 265, 276 (6th Cir. 2019).

### 2. The District Court's Consideration of Outside Information

EMS makes multiple arguments regarding the district court's consideration of (or refusal to consider) information outside of the pleadings. Chiefly, EMS argues that the district erred (1) in taking judicial notice of EMS's filing in Procom's bankruptcy proceeding, without converting the motion to dismiss into a summary judgment motion and allowing EMS to present other evidence, and (2) in refusing to consider the Moenich Affidavit. Neither of these arguments is persuasive.

Generally, in considering a motion to dismiss, the district court is confined to considering only the pleadings, or else it must convert the motion into one for summary judgment under Rule 56. *See Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). However, the court may, in undertaking a 12(b)(6) analysis, take judicial notice of "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." *Golf Vill. North, LLC v. City of Powell*, 14 F.4th 611, 617 (6th Cir. 2021) (quoting *Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020)). Courts may consider public records for the truth of the statements contained within them only when the "contents prove facts whose accuracy cannot reasonably be questioned." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005). We review challenges to a court's decision-making regarding whether to take judicial notice of facts for abuse of discretion. *See Price v. Jefferson County*, 9 F. App'x 369,

370 (6th Cir. 2001); *Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court*, 894 F.3d 235, 245 (6th Cir. 2018).

The district court took judicial notice of EMS's filing in the bankruptcy proceeding "for the limited purpose of confirming when the chargebacks occurred." R. 49 at PID 427. The court used the filing to conclude that all chargebacks occurred "in March 2020 or later." *Id.* at PID 428. This fact was, but is no longer, disputed.

Relying on *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011), EMS argues that the district court erred in considering this information without "convert[ing] the Motion to Dismiss to a motion for summary judgment" because "the bankruptcy matter was not referred to in the Amended Complaint." Appellant's Br. at 10.[3] That case states:

> If a court does consider material outside the pleadings, the motion to dismiss must be treated as a motion for summary judgment under Rule 56 and all parties must be given a reasonable opportunity to present all material pertinent to the motion. However, a court may consider "exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to a defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein," without converting the motion to one for summary judgment.

*Rondigo*, 641 F.3d at 680 (internal citation omitted) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). EMS appears to allege that the phrase "so long as they are referred to in the complaint" modifies the entire list of items the district court may consider, and thus that it was improper for the district court to consider the bankruptcy filing because it was not referred to in EMS's complaint.

But it is clear to this Court that that phrase applies only to "exhibits attached to a defendant's motion to dismiss," not to public records or any other item in the list. *Cf. Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) ("In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the

---

[3]EMS does not challenge the district court's conclusion that the bankruptcy filing constitutes a public record. EMS also does not allege that the district court erred in considering the filing for the truth of its contents, nor does it dispute the facts contained within the filing.

complaint, also may be taken into account. . . . *This circuit has further held that documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.*") (cleaned up and emphasis added). Thus, it was not improper for the district court to consider the bankruptcy filing without converting the motion to dismiss into a motion for summary judgment.

> Regarding the Moenich affidavit, the district court stated:

> The Court has ultimately disregarded the . . . affidavit for its Rule 12(b)(6) analysis. EMS submitted this affidavit, in part, to provide facts about Procom's chargeback debt, but none of this information is alleged in the first amended complaint. Thus, the Court will not consider the affidavit's contents because Rule 12(b)(6) review is limited [to] the complaint, attendant contracts, and public records.

R. 49 at PID 427, n.4. EMS's argument that the district court erred in refusing to consider the Moenich affidavit is unclear. The gist appears to be that because the district court allegedly should have converted the motion to dismiss into a motion for summary judgment, it "should have also allowed Appellant to provide Rule 56 evidence, including the Affidavit of Daniel Moenich." Appellant's Br. at 10. But EMS provides no specific argument as to why the district court's refusal to consider the affidavit—which does not fall into any of the categories of information which the district court may consider in addition to the pleadings in reviewing a motion to dismiss, *see Golf Vill. North*, 14 F.4th at 617—was on its own improper. Under these circumstances, we cannot say that the district court abused its discretion in refusing to consider the affidavit.

And even if the district court did err in considering the bankruptcy filing or refusing to consider the Moenich affidavit, any error was harmless because EMS points to no legitimate way in which the analysis of the motion to dismiss would differ if the bankruptcy filing had been excluded or the affidavit included. *Cf. Bates v. Green Farms Condo Ass'n*, 958 F.3d 470, 484 (6th Cir. 2020) ("[E]rror will be treated as harmless if the dismissal can be justified without reference to any extraneous matters." (quoting 5C CHARLES A. WRIGHT ET AL., *Federal Practice and Procedure § 1364*, at 63 (3d ed. Supp. 2019))); *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020) ("[A] district court's failure to convert a motion

for judgment on the pleadings into a motion for summary judgment 'will not necessarily mandate reversal unless the record discloses the existence of unresolved material fact issues, or the parties represent that they would have submitted specific controverted material factual issues to the trial court if they had been given the opportunity.' . . . In other words, a district court's failure to treat the motion as one for summary judgment does not require reversal if the error was harmless." (citation omitted)).

EMS argues that, "[b]y disregarding the Affidavit of Daniel Moenich, in conjunction with reviewing the bankruptcy court records, the District Court did not allow Appellant to argue that the transactions occurring before the 2019 Agreement was signed, although charged back after the 2019 Agreement signature, fall under the 2014 Agreement." Appellant's Br. at 10. But this is simply untrue. The district court expressly addressed and rejected that exact argument, and EMS points to no additional facts within the Moenich Affidavit that would change the district court's conclusion. As stated, it is no longer even contested that chargebacks occurred only after the execution of the 2019 Agreement, which was what the district court looked to the bankruptcy filing to prove, and what EMS attempted to incorrectly disprove with the Moenich Affidavit. And although EMS makes vague allegations in other sections of its brief that the affidavit contains evidence of EMS's intent regarding the effect of the 2019 Agreement on the 2014 Agreement, the district court concluded—correctly, as detailed below—that intent was irrelevant to the analysis because the 2019 Agreement is unambiguous. We therefore reject EMS's argument that the district court committed reversible error in considering the bankruptcy filing and excluding the Moenich Affidavit.

### 3. When Did the Chargeback Debt Accrue

The plain language of Gaal's guaranty applies solely to Procom's obligations accrued under the 2014 Agreement, and not to any obligations which arose under the 2019 Agreement that superseded it; Gaal "guarantee[d] the full and prompt payment of any and all amounts owed to BANK and EMS and the performance of all MERCHANT'S obligations *under this Agreement*." R. 40-1 at PID 278 (emphasis added). The issue thus becomes whether any of the chargeback debt that EMS seeks to recoup from Gaal accrued under the 2014 Agreement. EMS argues that the chargeback debt accrued when the original transactions that were charged back

occurred, while Gaal argues (and the district court found) that the debt accrued when the chargebacks themselves occurred. We agree with EMS: any chargeback debt related to transactions which occurred prior to the execution of the 2019 Agreement constitutes an obligation arising under the 2014 Agreement, for which Gaal may be liable under his guaranty.

The accrual date of chargebacks appears to be a question of first impression for Ohio and for this circuit. Neither party—nor the district court—has cited any on-point case. Courts in other circuits have dealt with a similar issue in the bankruptcy context—when a debt contingent on a future event, such as chargeback debt, accrues for bankruptcy purposes—and have concluded that "[a] debtor incurs a debt when he becomes legally obligated to pay it." *In re Southmark Corp.*, 62 F.3d 104, 106 (5th Cir. 1995); *see also United States v. Gerth*, 991 F.2d 1428, 1433–34 (8th Cir. 1993) ("[D]ependency on a postpetition event does not prevent a debt from arising prepetition. . . . A debt can be absolutely owing prepetition even though that debt would never have come into existence except for postpetition events. . . . [A] contingency does not change when a claim arises. . . ."); *In re Griffin*, 313 B.R. 757, 762 n.4 (Bankr. N.D. Ill. 2004). Specifically, in the case of chargeback debt, the Fifth Circuit found that chargebacks that occurred after the filing of a bankruptcy petition, but which related to transactions that occurred prior to filing, "arose" before the filing for bankruptcy purposes. *In re United Sciences of America, Inc.*, 893 F.2d 720, 724 (5th Cir. 1990). The court noted: "[the] right to payment, and hence [the debtor's] debt to [the creditor], arose not later than when the charged back item was initially credited to [the debtor's] account, regardless of when the issuing banks actually asserted their chargeback claims." *Id.*

We find the logic of these cases persuasive in this context. Under the 2014 Agreement, once EMS credited Procom with the purchase amounts (ostensibly when or soon after the purchases were made), Procom assumed a legal obligation to pay back that amount if any chargebacks later occurred. As the 2014 Agreement states:

> [A]n authorized sale does not constitute a guarantee of payment, *only available credit*, and may be subject to dispute or chargeback . . . EMS *shall have the right to debit* the Merchant's Designated Account, incoming transactions or any other funds of the Merchant in . . . EMS's direct or indirect control by reason of . . . EMS's security interest granted by Merchant . . . for the face amount of any transaction and to chargeback such transaction . . . .

R. 40-1 at PID 280 (emphasis added). EMS thus had a right to repayment when the transactions were made and Procom's account was credited by EMS, even if that right to repayment was contingent upon a future event (the chargebacks). *Cf. United Sciences*, 893 F.2d at 724. The chargeback debt for any transactions made while the 2014 Agreement was in effect thus constitutes an obligation arising under the 2014 Agreement, even if the actual chargebacks occurred after the 2019 Agreement superseded the 2014 Agreement.[4] The district court therefore erred in holding to the contrary.

### 4. The Effect of the 2019 Agreement

Having concluded that EMS adequately stated forth a claim of relief under the 2014 Agreement, and given that Gaal is a signatory only to the 2014 Agreement and its guaranty provision, we must finally determine the effect of the 2019 Agreement on the 2014 Agreement— i.e., whether and to what extent the 2019 Agreement abrogated the 2014 Agreement. There are multiple possibilities here: (1) that the 2019 Agreement merely supplemented the 2014 Agreement (including Gaal's guaranty provision), leaving Gaal's obligations under the 2014 Agreement completely unaffected by the 2019 Agreement, as EMS argues;[5] (2) that the 2019 Agreement terminated the 2014 Agreement, cutting off Gaal's liability under the guaranty provision after the execution of the 2019 Agreement, but preserving his liability for obligations accrued before that date; or (3) that the 2019 Agreement constituted a novation, completely eliminating Gaal's liability for debts accrued before and after the execution of the 2019 Agreement.

---

[4]The district court and Gaal place weight on the fact that EMS allegedly sought a $45 fee per chargeback in bankruptcy court for the transactions, despite the fact that supposedly only the 2019 Agreement contemplates a $45 chargeback fee, with the 2014 Agreement allegedly capping chargeback fees at $25. But EMS argues that the 2014 Agreement contemplates a $45 chargeback fee. The 2014 Agreement mentions a $45 chargeback fee and a $25 chargeback fee in separate locations. Thus, EMS seeking a $45 chargeback fee in the separate bankruptcy proceeding is not, at this stage, concrete evidence that EMS believes that the chargebacks arose under the 2019 Agreement.

[5]Gaal alleges that EMS has "forfeited and waived any argument that the 2019 agreement was not a novation" by "fail[ing] to raise any meaningful objection below and . . . fail[ing] to identify or brief the issue on appeal." Appellee's Br. at 24–25. However, EMS argued before the district court and in its briefs before this Court that "[t]he 2019 Agreement supplemented the 2014 Agreement, and was a mere formality," Appellant's Br. at 16, clearly arguing in substance if not in name that the 2019 Agreement was not a novation.

First: termination.**6** In interpreting a contract under Ohio law, "[i]f the contract terms are not ambiguous, courts apply the plain language of the contract." *New Lansing Gardens Hous. LP v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 521 (6th Cir. 2022). Where a contract's terms are unambiguous, extrinsic evidence is not admissible to clarify or supplement the terms, and evidence of subjective intent of the parties is irrelevant. *See Wilkerson*, 997 F.3d at 668 ("If, however, the contract is facially ambiguous, the court may resort to evidence outside the contract to determine its meaning."); *Susany v. Guerrieri*, 48 N.E.3d 637, 644 (Ohio App. Ct. 2016) ("[T]he parties' subjective intent at the time of contracting is irrelevant in ascertaining whether the language is ambiguous"); *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (Ohio 2003). A subsequent contract between parties may supersede terms in a preceding contract only where "the subsequent agreement specifically evidences an intent to do so." *Jackson v. Sunnyside Toyota, Inc.*, Ohio App. 3d 370, 377 (Ohio App. Ct. 2008) (quoting *Trinova Corp. v. Pilkington Bros.*, 70 Ohio St.3d 271, 276–77 (Ohio 1994)).

We agree with the district court that the 2019 Agreement terminated the 2014 Agreement such that Gaal incurred no liability under his guaranty provision for debts accruing under the 2019 Agreement. The 2019 Agreement—which was a form contract drafted by EMS—explicitly states:

> This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses *the entire agreement and understanding* between [Procom], Bank and EMS with respect to the subject matter hereof and *supersedes all prior and contemporaneous agreements and understandings*, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written.

R. 40-2 at PID 291 (emphasis added). This language clearly and unambiguously provides that the terms of the 2019 Agreement replace the terms of the 2014 Agreement, terminating the 2014 Agreement. No extrinsic evidence is needed or admissible to interpret these unambiguous terms.

---

**6**EMS argues that the question of whether the 2014 Agreement was terminated is a factual dispute inappropriate for resolution at the 12(b)(6) stage. However, as stated previously, where, as here, contract language is unambiguous—and thus extrinsic evidence inadmissible—interpretation of that contract is a legal question for the court, suitable for 12(b)(6) analysis. *See Constr. Interior*, 984 F.2d at 754; *Fifth Third*, 925 F.3d at 276.

The 2019 guaranty provision—which was signed by a different EMS employee, Watkins—therefore terminated and replaced the 2014 guaranty provision that Gaal signed.

Not once in its briefs does EMS even attempt to argue that the language in the 2019 Agreement was ambiguous, offer an alternative reading of its language, or explain why EMS's alleged intent is not reflected in the terms of the contract that it itself drafted. The chief case that EMS cites in support of its position, *Chapman Drug Co. v. Brewer*, 390 F.Supp.264, 266, (E.D. Tenn. 1974), is not binding on this Court and is also inapposite. In that case, the defendant operated pharmacies under a certain corporation, and had signed a guaranty agreement with the plaintiff regarding debts owed to the plaintiff by the corporation. *Id.* at 265. The defendant later advised the plaintiff that the pharmacies had begun operating under a different corporation. *Id.* Later, when money was owed to the plaintiff for purchases for the pharmacies, the plaintiff sued the defendant, arguing that the guaranty still applied and that he was liable for the debt. *Id.* The court concluded that the defendant was still liable for the debt under the guaranty because the guaranty was never clearly revoked, and because it was "evident from the record that despite the name changes and shift in corporate forms, plaintiff looked to defendant as guarantor of the transactions and that this was the intent of the parties when the original agreement was signed." *Id.* at 266. Here, despite EMS's contentions that the 2019 Agreement was a mere formality, the language of the 2019 Agreement clearly revoked the terms of the 2014 Agreement, and explicitly instated a new guarantor. Thus, the logic of *Chapman* does not apply.

Next: novation. Just because the 2019 Agreement superseded and terminated the 2014 Agreement does not automatically mean that the 2019 Agreement also extinguished Gaal's liability under the 2014 Agreement for debts already accrued under that agreement. Mere termination or expiration of an agreement alone does not automatically terminate obligations already accrued. *See CBS Personnel Servs., LLC v. Canadian Am. Trans, Inc.*, 290 F. Supp. 2d 879, 884 (S.D. Ohio 2003) (finding that the personal guaranty in an earlier agreement was superseded by a subsequent agreement, but that the new agreement "did not extinguish any past liabilities accrued pursuant to prior agreement," and that the guarantor was liable only for debts "accrued pursuant to [the] prior agreement . . . during the period when the guaranty he signed was in effect"); *R.L.R. Inv., LLC v. Wilmington Horsemens Group, LLC*, 2014-Ohio-4757, at *25

(Ohio App. Ct. 2014) (finding that the termination of a guaranty clause "did not affect liabilities incurred prior to the termination"); *Steele v. Goyner*, 1 Ohio App. 331, 333–34 (Ohio App. Ct. 1913) (finding that a second guaranty did not extinguish liabilities incurred by the defendant under a previous guaranty before the second guaranty took effect); *cf. Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 340 (5th Cir. 2004) (discussing agreement amongst the Fourth and Ninth circuits that "rights that have vested or accrued under a contract prior to the termination of the contract, are not automatically extinguished upon termination" and noting that it cannot locate "any cases from other circuits which hold otherwise"). To extinguish liabilities already accrued, then, more than an agreement to terminate is needed: there must be an intentional agreement between the parties to eliminate accrued obligations. *Wells Fargo Bank, N.A. v. Perkins*, 2011-Ohio-3790, at \*22 (Ohio App. Ct. 2011) ("Whatever the form of the subsequent agreement discharging the prior contractual obligation, it is only enforceable if there is a meeting of the minds as to its essential elements.").

The district court did not address whether the 2019 Agreement was a novation, concluding only that the 2019 Agreement terminated the 2014 Agreement—and Gaal's liability—moving forward. Indeed, it was not necessary for the district court to reach the question of Gaal's liability under the 2014 Agreement, considering the court concluded that all the chargeback debt accrued under the 2019 Agreement, making Gaal not liable for any of it regardless. Because we are "a court of review, not first view," *Taylor*, 11 F.4th at 489 (citation omitted), we leave this issue to the district court to address in the first instance.

\* \* \*

We thus reverse the district court's dismissal of EMS's breach-of-guaranty claim against Gaal under Fed. R. Civ. P. 12(b)(6). However, Gaal asserted below—and preserved on appeal—a lack-of-personal-jurisdiction defense that the district court declined to reach as unnecessary. Because neither party briefed the issue before this Court, we remand to the district court to also decide the personal-jurisdiction issue in the first instance. And, because we reverse the district court's dismissal of the breach-of-guaranty claim, we need not address whether the district court erred in dismissing the cause of action with prejudice.

## V.  CONCLUSION

In sum, we REVERSE the district court's dismissal of Appellant's breach-of-guaranty claim, and REMAND for further proceedings consistent with this opinion.